In re TELECTRONICS PACING SYS-
TEMS, INC., Accufix Atrial "J" Leads
Products Liability Litigation.

Nos. MDL–1057, C–1–95–087.

United States District Court,
S.D. Ohio,
Western Division.

April 2, 1997.

Stanley M. Chesley, Waite, Schneider, Bayless & Chesley, Cincinnati, OH, Richard S. Wayne, Matt Kammerer, Strauss & Troy, Cincinnati, OH, Ron Parry, Arnez, Parry & Wentz, Covington, KY, for plaintiff—Liason.

Frank C. Woodside, III, James A. Comodeca, Gina Saelinger, Dinsmore & Shol, Cincinnati, OH, Charles P. Goodell, Jr., Richard M. Barnes, Goodell, DeVries, Leech & Gary, Baltimore, MD, for defendants—Telectronics and TPSI.

Gerald Rapien, Daniel Warnke, Taft, Stettinius & Hollister, Cincinnati, OH, S. Patrick McKey, Gardner, Carton & Douglas, Chicago, IL, for Pacific Dunlop Ltd. & Nucleus Ltd.

## ORDER GRANTING IN PART PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION

SPIEGEL, Senior District Judge.

This matter is before the Court on Plaintiffs' Renewed Motion for Class Certification (doc. 211), Telectronics' Memorandum in Opposition (doc. 271), Plaintiffs' Reply (doc. 284) and Telectronics' Supplemental Memorandum (doc. 288). The Court held oral argument on the motion on February 3, 1997. The Court granted the Parties an additional

two weeks to supplement their arguments. Plaintiffs filed a post-hearing brief (doc. 346), as did Telectronics (doc. 348) and Pacific Dunlop Limited and Nucleus Limited (doc. 349). Telectronics also submitted a memorandum concerning a recently a decided case (doc. 351).

In order to make this Order easier to read, the Court provides this outline of the structure of the Order.

I. Background
  A. The Parties
  B. The "J" Lead Controversy
  C. Procedural History
  D. Class Structure

II. Elements of Rule 23(a)
  A. Rule 23(a)(1) Numerosity
  B. Rule 23(a)(2) Commonality
  C. Typicality & Adequacy of Representation

III. Elements of Rule 23(b) and Medical Monitoring Class
  A. Class Certification of Medical Monitoring pursuant to Rule 23(b)(1)(A)
  B. Class Certification of Medical Monitoring pursuant to Rule 23(b)( )(B)
  C. Class Certification of Medical Monitoring pursuant to Rule 23(b)(3)

IV. Negligence and Strict Liability Subclasses and Rule 23(b)
  A. Do Common Issues Predominate?
  B. Is Class Treatment Superior?
    1. Negligence Subclasses
    2. Strict Liability Subclasses

V. Punitive Damages

VI. Conclusion

For the fourth time in little more than a year,[1] this Court addresses the question whether class certification is appropriate in this case. There has been much discussion regarding the need to reform or improve how federal courts deal with mass tort litigation. While we agree changes might be appropriate, the district courts are left to fight the battles and resolve the Parties disputes' with the tools provided by Congress and our appellate courts. Thus, we must grant or deny certification on the basis of the federal rules as written today and interpreted by the Sixth Circuit and the Supreme Court.

In deciding this question, the Court is mindful of the applicable law and rules, the procedural and substantive legal rights of the Parties and the ethical concerns raised by adjudication of mass tort claims. Recently, several Circuit Court's have been highly critical of the use of class actions in mass tort and product liability cases. While we recognize the difficulties inherent in diversity based-class actions as outlined by the Circuit Courts, we continue to believe that class action provides the fairest, most efficient and economical means of dealing with these types of cases. We believe courts must play an important role in the efficient resolution of mass tort action. This is especially so where, as here, there is a danger that the expense of litigation and potential for large damage awards threaten to bankrupt the defendant and leave some class members without a remedy. *See* Marc Z. Edell, *Resolution of Mass Tort Litigation: Practitioner's Guide to Existing Methods and Emerging Trends,* C949 ALl–ABA 37 (1994) (noting that class actions have value in conserving resources of plaintiffs, defendants and the courts).

We also strongly disagree with those Circuit Courts which have allowed their apparent economic biases to influence their interpretation of the requirements of Rule 23. For example, in *Castano v. American Tobacco Co.,* 84 F.3d 734 (5th Cir.1996), the Fifth circuit found that class certification of all nicotine dependent individuals was not superior under Rule 23(b)(3) because of the strategic effect class certification has upon the defendants' chances.

In the context of mass tort class actions, certification dramatically affects the stakes for defendants. Class certification magni-

---

1. On November 17, 1995, the Court granted Plaintiffs' Motion to Certify this case as a class action (doc. 89). On February 23, 1996, the Court reconsidered in part our November 17th Order and decertified the foreign class (doc. 137). Finally, in light of the Sixth circuit's re-cent ruling *In re American Medical Systems, Inc.,* 75 F.3d 1069 (6th Cir.1996), the Court decertified the class action on July 16, 1996 (doc. 189), recognizing that Plaintiffs would file a renewed motion for class certification consistent with our analysis in Document 189.

fies and strengthens the number of unmeritorious claims. Aggregation of claims also makes it more likely that a defendant will be found liable and results in significantly higher damage awards.

*Id.* at 746 (citations omitted); *See also Matter of Rhone–Poulenc Rorer Inc.,* 51 F.3d 1293 (7th Cir.1995). To credit the Fifth Circuit's statement is to also state that its converse—denying class certification makes it less likely defendants will be found liable or responsible for lower damage awards—is true. Plaintiffs in individual actions will have to bear a greater share of the cost and risk for maintaining their action as compared to plaintiffs in a class action. Often an individual action pits a single plaintiff relying on his or her own resources to fund the litigation against the vast resources of a large manufacturer and the large law firms which represents it.

Obviously, the procedural rules affect the outcome of litigation. These Circuit Courts seemed to ignore the essence of Rule 23 because of their philosophical disagreement with the effects of Rule 23.

# I

## Background

### A. The Parties

This is a products liability action concerning pacemakers containing the Accufix Atrial "J" Lead. Plaintiffs in this action are recipients of the Accufix Atrial "J" Lead Pacemaker Model 330–801 and Model 329–701 ("J Lead").

Defendant, TPLC, Incorporated ("TPLC"), is a Delaware corporation engaged in the business of designing, manufacturing, and marketing medical devices including the Accufix Atrial "J" Lead pacemakers at issue in this case. They manufactured the "J" Lead pacemakers Models 330–801 and 329–701 from 1988 until 1994. Defendant, Telectronics Pacing Systems, Incorporated ("TPSI"), is also a Delaware corporation. TPSI's sole business is to hold certain industrial property rights, real estate and the equity interest in TPLC.

Defendants, Pacific Dunlop Limited ("PDL") and Nucleus Limited ("Nucleus") (collectively the "Australian Defendants"), are Australian corporations. Nucleus is a holding company involved in the medical products industry. Nucleus owns a group of companies that design, manufacture and sell pacemakers and defibrillators around the world under the trade name "Telectronics Pacing Systems" or "Telectronics." TPLC and TPSI are the two Telectronics Companies that operate in the United States (hereinafter TPLC and TPSI are referred to as either "TPLC" or "Telectronics").

In 1988, PDL purchased Nucleus and thus became beneficial owner of TPLC and TPSI. It is in the business of manufacturing, marketing and distributing industrial and consumer products on a worldwide basis. PDL is organized into five core business areas (automotive, distribution, consumer products, building and construction and health care) consisting of over 225 separate corporate affiliates and subsidiaries and has annual sales worldwide of approximately $5.5 billion.

### B. The "J" Lead Controversy

A pacemaker is a device that uses electrical impulses to reproduce or regulate the rhythms of the heart. *Dorland's Illustrated Medical Dictionary,* (28th ed.1994). It is driven by a battery and connected to the heart by leads and electrodes. *Id.*

The heart pacing system at issue consists of three main parts: a pulse generator, leads, and a programmer. Pacemaker Models 330–801 and 329–701 utilize a retention wire to hold the atrial lead in the shape of a "J". The lead's retention wire is a filament of one of two metal alloys, Elgiloy or MP35N. (TPSI, Letter of Duane A. Schultz, Vice President Clinical and Regulatory Affairs, Premarket Notification to FDA, December 18, 1989). Both Elgiloy and MP35N are nickel-cobalt based alloys which are "virtually equivalent in composition, chemical and physical properties." *Id.*

The retention wire is encased in polyurethane insulation and bends back and forth within the system. The bending has caused the retention wire to break in some instances and poke through the polyurethane. The

retention wire is not electrically active in the pacing circuit. Consequently, it has nothing to do with the conduction of the electrical signal or the operation of the pacing system. A fracture, however, can cause serious injury to the heart or blood vessels if it pokes through the polyurethane.

Approximately 25,000 pacemakers with "J" Leads were implanted in hearts of United States residents. Between December 1988 and February 1993, TPLC received reports of at least seven fractures of "J" Lead retention wires. On October 21, 1994, TPLC notified the Food and Drug Administration ("FDA") that it was recalling all unsold leads. Telectronics' President, James W. Dennis, then sent a letter to all doctors on November 3, 1994, notifying them that TPLC was voluntarily recalling all un-implanted Accufix Atrial "J" Lead pacemakers, Models 330–801 and 329–701.

By August 1996, TPLC had received notice of at least thirty-two injuries due to fractures, including six deaths. (Def. Ex. 12A, TPLC Dear Doctor Letter of August 23, 1996). Additionally, eight others have died while having their lead extracted. (Id.) On February 10, 1995, TPLC estimated the incidence of suspected fracture at 12%. (Pl.Ex. 10, Letter of Graham Vale and attachments). Other TPLC documents indicate that the fracture rate may be as high as 20%. (Def.Ex. 12A).

In response to the fracture problem, TPLC has done three things to control the situation. First, TPLC has established the Accufix Research Institute ("ARI") to manage the lead recall. The ARI communicates with doctors and patients concerning patient management recommendations. ARI is conducting a Multi–Center study ("MCS") involving twelve hospitals to monitor a subset of leads over time. ARI analyzes the data from the MCS to assess the risk of injury from the "J" wire fracture as well as the risk of injury from lead extraction.

Secondly, TPLC formed a Physicians Advisory Committee ("PAC") to provide advice concerning clinical management of lead patients. The PAC reviews information from the MCS and other sources. The PAC then makes recommendations to the ARI concerning patient care.

Upon the PAC's recommendation, Telectronics sent a letter to doctors advising them that implantees should receive screening for fractures every six months. (Pl.Ex. 8, TPLC Dear Doctor Letter of January 23, 1995). The letter stated in part:

The "J" shaped retention wires in the Accufix Atrial leads can fracture. There are various classifications of fracture. However, patient injury can occur only after the fractured wire has protruded through the outer lead insulation. Fluoroscopy can detect a fracture prior to this happening.

. . . . .

Therefore, Telectronics is now recommending the fluoroscopic screening of all patients implanted with these leads for fracture of the "J" shaved retention wire.

(Id.) (emphasis in original).

Finally, TPLC has agreed to "reimburse reasonable unreimbursed medical expenses for screening and Lead extraction that are consistent with patient management guidelines." (McConchie Affidavit at ¶ 9).

## C. Procedural History

Plaintiffs, Elise and Eugene Owens, filed the lead action in this case on February 13, 1995, alleging injury due to a defective "J" lead. Plaintiffs allege that it was TPLC's negligent manufacture or design of the "J" Lead that causes the retention wire to fracture. The Panel on Multi–District Litigation ("MDL Panel") selected this Court as the transferee court for all claims involving the Accufix "J" Lead. Presently, over 400 cases are pending before this Court for pretrial proceedings.

The Court appointed a Plaintiffs' Steering Committee ("PSC") to coordinate discovery and other pretrial proceedings on behalf of Plaintiffs in the cases transferred to this Court. The Court ordered the PSC to file a Master Complaint. On July 20, 1995, Plaintiffs filed an Amended and Consolidated Master Class Action Complaint asserting thirteen claims for relief: strict liability, negligence, failure to warn, breach of implied warranty, breach of express warranty, fear of

future product failure, intentional infliction of emotional distress, negligent infliction of emotional distress, fraud, misrepresentation, medical monitoring, loss of consortium, and punitive damages. (doc. 37).

The Court initially certified a worldwide class of all "J" Lead implantees for the common issues of medical monitoring, negligence, strict liability, fraud, misrepresentation, and breach of warranty. (doc. 89). On February 23, 1996, the Court decertified the international class. (doc. 137). TPLC moved to have the Court reconsider the class certification in light of the Sixth Circuit's decision in *In re American Medical Systems*, 75 F.3d 1069 (6th Cir.1996). On July 16, 1996, the Court granted the motion to reconsider and decertified this case as a class action (hereinafter Decertification Order). (doc. 189).

### D. Class Structure

Plaintiffs have now filed a Renewed Motion for Class Certification. Plaintiffs, however, have moved to certify only four causes of action as a class action: medical monitoring, negligence, strict liability and punitive damages. Furthermore, Plaintiffs seek to certify this action against only TPLC and TPSI; they have not sought certification against the Australian Defendants.

Plaintiffs seek to certify a nationwide class on claims of medical monitoring, negligence, strict liability and punitive damages. State products liability law encompasses several different causes of action.

"That branch of the law commonly called "products liability" is often spoken of as a unitary, coherent body of statute and precedent when in fact there are at least three common theories of recovery for damages sustained as a result of a defective product. In a "products liability" case, a plaintiff may seek recovery, as did this plaintiff, upon (1) a theory of negligence; (2) a theory of "strict liability,"; or (3) a theory of breach of warranty, either express or implied."

*Ragland Mills, Inc. v. General Motors Corp.*, 763 S.W.2d 357, 359 (Mo.App.1989) (citations omitted). However, not all states permit all three causes of action in products lability actions. *See e.g.*, O.R.C. § 2307.71 et seq. (establishing strict liability as the exclusive remedy in all products liability actions); *Washington Water Power Co. v. Graybar Elec. Co.*, 112 Wash.2d 847, 774 P.2d 1199, 1204 (1989) (finding that Washington Product Liability Act, RCWA 7.72.010(4), preempts common-law causes of action for harms caused by product defects).

In our Decertification Order, we found that Plaintiffs must demonstrate how this case can be managed as a class action in light of the variations in state law. Furthermore, we required Plaintiffs to come forward with exact definitions of subclasses, its representatives, and the reasons each subclass meets the requirements of Rule 23. Consequently, Plaintiffs have proposed ten subclasses (Subclass 6 contains three sub-subclasses) which take into account the variations of state law.

First, Plaintiffs propose one nationwide subclass for all medical monitoring claims. It is defined as follows:

SUBCLASS ONE: all persons who have had the Accufix atrial "J" pacemaker leads, Model 330–801 and Model 329–701 placed in their bodies whose leads have not been explanted and who seek the establishment of a medical monitoring and research program.

The medical monitoring program which Plaintiffs seek would provide diagnostic testing for each class member, as well as conduct research on better methods of detecting fractured leads and determine safer methods for removing the fractured leads.

Plaintiffs seek to certify two negligence subclasses. Subclass Two would represent "J" Lead implantees who reside in states whose law permits a cause of action for negligence in a product liability action and allows the introduction of the state-of-the-art evidence.[2] Subclass Three would be made up of

---

**2.** State-of-the-art evidence is "evidence that a product's danger was scientifically undiscoverable at the time the defendant distributed the product." *Becker v. Baron Bros., Coliseum Auto Parts, Inc.*, 138 N.J. 145, 649 A.2d 613, 617

(1994). "[T]he effect of the 'state-of-the-art' defense is to permit a defendant to rebut the presumption of knowledge of its product's harmful propensities ... by proving the impossibility of knowledge, even by experts in the field." *Fisch-*

"J" Lead implantees residing in states whose law does not allow introduction of state-of-the-art evidence in negligence actions.

Plaintiffs have proposed four strict liability subclasses. Subclass Four consists of implantees from states which follow Restatement (Second) of Torts Section 402A[3] and which allow the introduction of state-of-the-art evidence. Subclass Five consists of implantees from states which follow Restatement (Second) of Torts Section 402A and which do not allow the introduction of state-of-the-art evidence. Subclass Six consists of implantees from states which follow a modified version of Restatement (Second) of Torts Section 402A and which allow the introduction of state-of-the-art evidence.[4] Subclass Six is further divided into three sub-subclasses based upon whether the state requires a showing that the product is defective, unreasonably dangerous of both. Subclass Seven consists of three states which follow the *Greenman v. Yuba Power Products,* formulation of strict liability.[5]

Plaintiffs propose three subclasses covering claims for punitive damages. Plaintiffs have divided the classes based upon level of culpability which must be shown in order to justify punitive damages.

Finally, Plaintiffs have chosen not to seek certification of the remaining causes of action: fraud, loss of consortium, breach of warranty, misrepresentation and infliction of emotional distress.

## II

### Elements of Rule 23(a).

In order to certify a case as a class action Plaintiffs must first show that the proposed class meets the requirements of Rule 23(a).

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Thus under Rule 23(a), there are four prerequisites to maintaining a class action: numerosity, commonality, typicality and adequacy of representation.

### A. Rule 23(a)(1)—Numerosity

■ Under Rule 23(a)(1), the putative class must be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). No strict numerical test exists to determine when a class is so numerous that joinder is impracticable. *American Medical Systems,* 75 F.3d at 1079. "When class size reaches substantial proportions, however, the impracticability requirement is usually satisfied by the numbers alone." *Id.* "Satisfaction of the numerosity requirement does not require that joinder is impossible, but only that plaintiff will suffer a strong litigational hardship or inconvenience if joinder is required." *Boggs v. Divested Atomic Corp.,* 141 F.R.D. 58, 63 (S.D.Ohio 1991) (citations omitted).

■ We find that the putative class, including each subclass, meets the numerosity requirement of Rule 23(a)(1). The proposed medical monitoring subclass would include the majority of the 25,000 United States recipients of the "J" Lead pacemaker; in other words, all recipients of the "J" lead who have not had their lead extracted would be members of this class.

er v. *Johns–Manville Corp.,* 103 N.J. 643, 512 A.2d 466, 472 (1986).

3. Restatement (Second) of Torts § 402A states that "[o]ne who sells any product in a defective condition unreasonably dangerous to the user ... is subject to liability for physical harm thereby caused to the ultimate user...."

4. States which apply a modified version of Restatement (Second) Torts § 402A incorporate

negligence elements into the strict liability formulation. *See e.g., Beam v. Tramco, Inc.,* 655 So.2d 979, 981 (Ala.1995).

5. Under *Greenman,* plaintiff need not show that the product was unreasonably dangerous but merely that the product was defective. *See e.g., Pratt & Whitney Canada, Inc. v. Sheehan,* 852 P.2d 1173, 1176 (Alaska 1993).

As for the two negligence subclasses, Plaintiffs point out that approximately 22,000 "J" Lead recipients reside in States represented by Subclass Two and 785 reside in States contained in Subclass Three. Additionally, each of the proposed strict liability subclasses contains over 1000 members. Furthermore, Defendants do not challenge that Plaintiffs' proposed subclasses meet the numerosity requirement. Therefore, we find that the numerosity requirement of Rule 23(a) is satisfied. *See In re AMS*, 75 F.3d at 1079 ("when class size reaches substantial proportions [ ] the impracticability requirement is usually satisfied by numbers alone.").

### B. Rule 23(a)(2)—Commonality

■ Rule 23(a)(2) requires a showing that there are "questions of law or fact common to the class...." Fed.R.Civ.P. 23(a)(2). "The commonality test 'is qualitative rather than quantitative, that is, there need be only a single issue common to all members of the class.'" *American Medical Systems*, 75 F.3d at 1080 (citing Herbert Newberg, et al., 1 *Newberg on Class* Actions, § 3–10 at 3–50 (3d. ed.1992); *see also Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988) (stating that "mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible.")).

■ There are several issues common to the medical monitoring subclass. One common question is whether, and to what extent, the "J" Lead recipients require medical monitoring. Second, Telectronics has raised two defenses which are common to all class members: (1) that it is providing an adequate monitoring program already, and (2) that the FDA, not the courts, has ultimate authority over Telectronics' response to the "J" Lead problem. Thus, the medical monitoring class satisfies the "commonality" prong of Rule 23(a).

The Court finds that there are several issues common to the proposed negligence and strict liability subclasses. This proposed class involves two models of pacemakers which are nearly identical. The "J" Leads all allegedly fail for the same reason—metal fatigue. (Telectronics Pacing Systems' Memorandum from Larry Wettlaufer and Mark Christensen, November 1, 1994, at ¶ 6.) Thus, whether Telectronics' conduct caused this fatigue failure or whether the "J" Leads are defective are a questions common to all class members.

In addition, Telectronics has asserted defenses common to all class members that relate to FDA regulations and the Medical Devices Act, which apply to all implantees whose devices were "approved" pursuant to FDA regulations. *See In re "Agent Orange" Product Liability Litigation*, 100 F.R.D. 718, 728 (E.D.N.Y.1983) (finding common issues predominated where critical defenses affected all class members equally).

### C. Typicality & Adequacy of Representation

■ Rule 23(a)(3) requires that "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3).

A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory.... The typicality requirement may be satisfied even if there are factual distinctions between the named plaintiffs and those of other class members.

*De La Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir.1983) (citations omitted); *see also Senter v. General Motors Corp.*, 532 F.2d 511, 525 n. 31 (6th Cir.1976) ("To be typical, a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law."). While a representative's claims need not mimic the claims of every class member, the named plaintiff must advance the interests of the class members. *American Medical Systems*, 75 F.3d at 1082; The plaintiffs bear the burden of establishing that the representatives' claims are typical of the class' claims. *American Medical Systems*, 75 F.3d at 1082.

■ Rule 23(a)(4) requires that the representative parties fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a)(4). "This prerequisite is essential to due process, because a final judgment in a class action is *binding* on all class members." *American Medical Systems*, 75 F.3d at 1083 (citing *Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940)) (other citations omitted) (emphasis added).

■ In *Senter*, the Sixth Circuit articulated two criteria district courts must use to determine the adequacy of the representation: "1) the representative must have common interests with the unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." 532 F.2d at 525 (citation omitted).

■ The typicality requirement of Rule 23(a)(3) is interrelated with the adequacy or representation requirement of Rule 23(a)(4). *See General Telephone Co. v. Falcon*, 457 U.S. 147, 157–58 n. 13, 102 S.Ct. 2364, 2371 n. 13, 72 L.Ed.2d 740 (1982).

The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.

Given this relationship numerous courts have analyzed the two criteria together. *See* 1 Newberg, *supra* § 3.22 at 3–129 (citing cases). In this case, Telectronics' challenges to the typicality and adequacy of the class representatives significantly overlap,

In our Decertification Order, we found that the claims of the unnamed plaintiffs' cases than on the similarity of the legal and primary reason we found the claims of the proposed class representatives from Ohio were atypical is that Ohio is one of the minority of states that does not recognize negligence as a cause of action in a products liability action. *See Jenkins v. Raymark Industries*, 782 F.2d 468, 472 (5th Cir.1986) ("The 'typicality' adequacy-of-representation requirement, although the remedial theories behind their claims."). Thus we found that in order to be typical, a class representative's theories of recovery must be similar to the absent class members'. *See Falcon*, 457 U.S. at 158 n. 13, 102 S.Ct. at 2371 n. 13 (stating that both the commonality and typicality requirements ensure that the "plaintiff's claim and the class' claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence").

■ Plaintiffs have rectified this problem by adding a number of class representatives. Plaintiffs now provide proper class representatives for each subclass because each subclass is represented by an individual whose home state's law permits the cause of action identified by the subclass. For example, the proposed class representatives for Subclass Two reside in states which recognize a negligence cause of action in a products liability case. Thus, by creating subclasses based upon causes of actions and providing class representatives whose home state's law recognizes the cause of action represented in the subclass, Plaintiffs have remedied the problem which made the original class representatives atypical—namely representing absent class members whose claims differed from their own.

However, Telectronics argues that many of the proposed class representatives are still either atypical or inadequate as class representatives.

■ First, TPLC asserts that several class representatives' claims are inadequate class members for the medical monitoring subclass because they have had their lead removed, and therefore, no longer require monitoring. We agree that Cecilia Plummer, Bruce Hopkins, Shelly Truskowski and James Lloyd are not adequate representatives for the medical monitoring class because their leads have already been extract-

ed. They no longer have a need for medical monitoring because the explantation of their leads eliminated the danger of injury due to a fractured lead.

■ Secondly, TPLC asserts that several of the putative class representatives would be inadequate representatives for the negligence and strict liability subclasses because their leads have not fractured, and therefore, they cannot state a claim. For example, TPLC argues that Ms. Plummer is not acceptable as a class representative because she cannot prevail on her claim "since there is no proof that TPLC has breached a duty with regards to the Lead, which was working properly when it was removed, and was undamaged at the time of the extraction." (doc. 271 at 45). While the Court must probe behind the pleadings in order to determine if class certification is proper, it is inappropriate for the Court to examine the merits of the claim in doing so. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 180, 94 S.Ct. 2140, 2153–54, 40 L.Ed.2d 732 (1974) ("[T]he question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."). Thus, a class representative cannot be found inadequate merely on the basis of the strength of his or her claims. On the other hand, Ms. Plummer is aware of her duty as class representative and is willing to travel to Cincinnati to perform her duty. Thus, she is an adequate class representative.[6]

Thirdly, TPLC argues that certain class representatives' claims are atypical because of unusual factual circumstances related to their claims. For example, TPLC asserts that Jamie Baldwin has had other medical problems and Chad Baker might have been injured playing football. These minor factual distinctions are insufficient to conclude that these representatives' claims are atypical. *See Senter*, 532 F.2d at 525 n. 31 ("To be typical, a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law.").

■ Fourthly, Telectronics argues that many of putative class representatives are inadequate because they lack detailed knowledge of the legal and factual bases of their claims. TPLC relies on our Decertification Order, which found that Lawrence Cheyne, Q.T. Edwards and Eugene Owens to be inadequate class representatives because they were unaware of their roles as a class representatives or were unaware of their duties as class representatives. (doc. 189 at 34–35). Telectronics, however, has unreasonable expectations regarding what the proposed class representatives must know about their role as representatives and the legal basis for their claims. For example, Telectronics asserts that Helen West is an inadequate representative because she did not state that she represents a strict liability subclass. Instead, Ms. West states that she thought that "Telectronics owes us a commitment. That . . . if indeed we do have to have the leads replaced is that they're going to be there ready to pay for it." (West Depo. at 68). Such a statement indicates to the Court that Ms. West will vigorously prosecute her claims against Telectronics. The Court finds no fault with Ms. West because she may be unaware of the technical intricacies of all of the class action causes of action. The class representative's complete understanding of the legal basis for the class claims is not required by Rule 23. *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 366, 86 S.Ct. 845, 847–48, 15 L.Ed.2d 807 (1966) (reversing dismissal of class claims where plaintiff "did not understand the complaint at all, . . . could not explain the statements made in the complaint [and] . . . had a very small degree of knowledge as to what the lawsuit was about . . . ."); *but c.f. Nilsson v. Coughlin*, 670 F.Supp. 1186, 1191 (S.D.N.Y.1987) (denying class certification motion by *pro se* prisoner based upon inadequacy of representation due to lack of legal knowledge). In fact, it is unrealistic to require a class action representative to have an in-depth grasp of the legal theories of recovery behind his or her claim.

---

**6.** Telectronics also argues that Urban Wittenburg, Bruce Hopkins, Jamie Baldwin, Ronald Taylor and Annette Catale are inadequate class representatives because their leads have not frac-

tured. Again, the Court may not determine a proposed class representative adequacy by examining the strength of his or her individual claim.

It is more important that the representative actively seeks vindication of his or her rights and engages competent counsel to prosecute the claims. *See In re American Medical Systems*, 75 F.3d at 1083 (" '[I]t must appear that the representative will vigorously prosecute the interests of the class *through* qualified counsel.' ") (quoting *Senter*, 532 F.2d at 525) (emphasis added).

Finally, Telectronics asserts that many of the new proposed class representatives are *per se* inadequate class representatives because they have not themselves filed an individual action against any of the Defendants. Telectronics argues that class representatives must sue the defendant individually in order to act as a class representative. Rule 23 states that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all...." Fed.R.Civ.P. 23(a). Telectronics contends that Federal Rules of Civil Procedure imply that "party" means active participant in the litigation.

■ While it seems unusual that a class representative has not sued individually, the Court finds no requirement in Rule 23 that they do so.[7] There is no dispute that the proposed class representative are members of the class. Generally, class members can be passive and are not required to intervene in the class action. *Manual for Complex Litigation (Third)*, § 30.16. When, and if, required the court may substitute new class representatives. 1 Newberg *supra* § 3.42. ("Under Rule 23, the court may create subclasses, limit the class scope ... [or] invite interventions to bolster or substitute for class representation."); *see also United States Parole Commission v. Geraghty*, 445 U.S. 388, 415–16 n. 8, 100 S.Ct. 1202, 1218–19 n. 8, 63 L.Ed.2d 479 (Powell, J., dissenting) ("If the named plaintiff's own claim becomes moot after certification, the court can re-

examine his ability to represent the interests of class members. Should it be found wanting, the court may seek a substitute representative or even decertify the class."). Thus, Rule 23 seems to contemplate the possible substitution of non-parties as class representatives. Furthermore, the class representatives, whether named in an individual action or not, will be bound by any judgment in the class action. Accordingly, we find it is unnecessary for a class member to have filed an individual action in order to qualify as a class representative.[8]

■ Finally, we note that courts make an inquiry into the adequacy of the class representatives in order to protect the rights of absent class members, not to ensure that the party opposing certification is satisfied with the representatives. *See Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 728 (11th Cir.1987) (reversing district court for setting too high a standard for adequacy because such a standard "could prevent vindication of the legal rights of the absent class members under the guise of protecting those rights."). Thus, we find that the putative class representatives' claims are typical. Furthermore, based upon our review of the putative class representatives' affidavits and depositions, we find that they meet the test for adequacy outlined in *Senter*, 532 F.2d at 525. Lastly, the Court finds class counsel are qualified and will adequately represent the interests of the class.

In conclusion, we find that Plaintiffs have shown that their proposed subclasses meet the numerosity and commonality requirements of Rule 23(a). We also find that Plaintiffs' proposed class representatives satisfy the typicality and adequacy prongs of Rule 23(a), except that the proposed class representatives who have had their implants removed are atypical of the claims for medical

---

7. Plaintiffs also assert that they are prepared to file individual lawsuits if the Court requires them do so.

8. In separate motions, TPLC has also moved to strike Jamie Baldwin (doc. 241), Urban Wittenburg (doc. 242), Shelly Truskowski (doc. 243)—Eva Sobolski (doc. 244), Mary Williams (doc. 245), Robert Star. (doc. 246); Chad Baker ' (doc. 247)-, Michael Kingera (doc. 248) Lyle Larson (doc. 249), and Helen West (doc. 250)/ 1 as class

representatives because they have failed to file suit against any of the Defendants. Plaintiffs responded (doc. 292) and᾽ Defendant replied (doc. 304). TPLC raised these identical arguments in its Memorandum in Opposition to Plaintiffs' Renewed Motion for Class Certification. For the reasons outlined in the text of this Order, we DENY the Motions to Strike for Failure to Sue.

monitoring. However, this inadequacy finding does not affect Plaintiffs putative medical monitoring subclass because several other proposed subclass representatives are adequate.

## III

### Elements of Rule 23(b) and Medical Monitoring Class

Having found the conditions of Rule 23(a) are met, we now move to whether the class proponent has shown that the proposed class satisfies at least one of the three subsections of Rule 23(b). *In re AMS*, 75 F.3d at 1079.

█ In order for a class action to be maintainable, the putative class must also satisfy one of the three subsections of Rule 23(b), in addition to the requirements of Rule 23(a). Rule 23(b) states as follows: ·

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b). The elements of Rule 23(b) overlap, and often a class may satisfy more than one of the subsections of Rule 23(b). 1 Newberg, *supra*, § 4.01.

█ Turning to the requirements of Rule 23(b) as applied to the specific subclasses, we find that certifying a medical monitoring class is justified under both Rule 23(b)(1)(A) and 23(b)(3). "Certification under Rule 23(b)(1) is appropriate when a unitary decision is essential." *In re Joint E & S Dist. Asbestos Lit.*, 129 B.R. 710, 824 (E. & S.D.N.Y.1991), *vacated on other grounds*, 982 F.2d 721 (2d. Cir.1992). "Rule 23(b)(1) classes are designed to avoid prejudice to the defendant or absent class members if individual actions were prosecuted in contrast to a class suit yielding a unitary adjudication." *Newberg, supra*, § 4.01. However, the possibility that some plaintiffs might recover and others might not does not justify class certification under Rule 23(b)(1)(A). *In re Bendeclin Prod. Liability Lit.*, 749 F.2d 300, 305 (6th Cir.1984).

### A. Class Certification of Medical Monitoring pursuant to Rule 23(b)(1)(A).

█ Rule 23(b) (1)(A) states that class certification is proper if separate actions "would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class...." Fed. R.Civ.P. 23(b)(1)(A). "The phrase 'incompatible standards of conduct' is thought to refer to the situation where different results in separate actions would impair the opposing party's ability to pursue a uniform continuing course of conduct." Charles A. Wright, et al., 7A *Federal Practice & Procedure*, § 1773 at 431 (2d ed.1986) (citing cases). "[S]ubdivision (b)(1)(A) is applicable when practical necessity forces the opposing party to act in the same manner toward the individual class members and thereby makes inconsistent adjudications in separate actions unworkable or intolerable." *Id.* at 434.

The medical monitoring claim here is an ideal candidate for class certification pursuant to Rule 23(b)(1)(A) because separate adjudications would impair TPLC's ability to pursue a single uniform medical monitoring program. *See Boggs v. Divested Atomic*

*Corp.,* 141 F.R.D. 58, 67 (S.D.Ohio 1991) (certifying claims remediation claims—medical monitoring, plant cleanup and nuisance abatement—under Rule 23(b)(1)(A)). Presently, TPLC is conducting a research program which is investigating the cause of the fractures, looking for better ways to detect the fractures and seeking safer methods of extracting the damaged leads. Plaintiffs seek the establishment of a medical monitoring program which would include diagnostic testing and research. TPLC asserts that medical monitoring beyond that recommended by TPLC's Physicians' Advisory Committee is not warranted. TPLC's research program is a uniform benefit to the class of "J" lead implantees as a whole. Any judicially-imposed modification of this program would then, by necessity, affect all of the "J" lead implantees. Furthermore, separate judicial orders pertaining to medical monitoring could require TPLC to institute differing types of monitoring programs which TPLC would have to reconcile.

TPLC argues that the recommendations of the Physicians' Advisory Committee are subject to approval by the FDA. TPLC insists that "the Court [will] have to reconcile its involvement in a medical monitoring program with FDA's statutorily mandated oversight function.... The potential for unnecessary conflict and expense with no patient benefit is readily apparent, with TPLC caught in an impossible position between the judicial and executive branches of government." (doc. 271 at 68). Whether FDA regulations preempt or otherwise limit state law tort claims for medical monitoring goes to the merits of the class claims and must be determined at a later date.

However, individual adjudication of implantees claims for medical monitoring would not alleviate TPLC's fear of conflicting standards of medical monitoring imposed by the judicial branch and executive branch. In fact, the danger of courts imposing conflicting duties upon Telectronics would only be compounded if the question of medical monitoring is not certified as a class action pursuant to Rule 23(b)(1)(A). Presently, there are over 400 individual actions consolidated before this Court by the Judicial Panel for Multidistrict Litigation. Certainly, a large number of similar cases are pending in state courts across the country. Thus, TPLC could still face multiple and conflicting orders rendered from different courts regarding the scope and necessity of a medical monitoring program which may also conflict with FDA imposed requirements. Accordingly, the Court CERTIFIES the medical monitoring subclass under Rule 23(b)(1)(A).

In addition to the danger of various courts mandating differing standards of conduct concerning monitoring, there are also significant policy reasons for requiring one medical monitoring class. Any research component should be coordinated in order to maximize resources and avoid duplication. To promote consistency in treatment, doctors should also be given one set of advice in terms of treatment options for their "J" lead patients.

### B. Class Certification of Medical Monitoring pursuant to Rule 23(b)(1)(B).

█ The argument for certification of a medical monitoring subclass is bolstered by the fact that separate adjudications may adversely affect other implantees' ability to recover anything. Under Rule 23(b)(1)(B), certification is justified if adjudications by individual class members might "as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests."[9] Fed. R.Civ.P. 23(b)(1)(B). The most common use of subsection (b)(1)(B) is in limited fund cases. 1 Newberg, *supra* § 4.09. "A limited

---

9. Initially, this Court certified the medical monitoring issue as an action for equitable relief under Rule 23(b)(2). In oral argument, the Court inquired whether this case might be appropriate for certification as a limited fund class under Rule 23(b)(1)(b). While Plaintiffs supported the concept, counsel did not present argument or evidence on the issue in their supplemental brief. The Court cannot certify a limited fund class without making findings concerning the existence of a limited fund. *See In re Bendectin Products Liability Lit.,* 749 F.2d 300, 306 (6th Cir.1984) (granting mandamus where district court failed to make factual opportunity to present evidence countering existence of a limited fund). Accordingly, the Court will not certify this action as a class under Rule 23(b)(1)(B).

fund exists when a fixed asset or piece of property exists in which all class members have a preexisting interest, and an apportionment or determination of the interests of one class member cannot be made without affecting the proportionate interests of other class members similarly situated." Id. In the same limited circumstances, the potential or probable insolvency of the defendant due to a large number of pending tort actions can create a limited fund appropriate for adjudication under Rule 23(b)(1)(B). *See e.g., In re Asbestos Litigation,* 90 F.3d 963, 983 (5th Cir.1996) (citing cases).

According to previous pleadings and the representations of counsel for both sides, TPLC has recently sold all of its assets to another corporation. Thus, TPLC is no longer an operating corporation. TPLC received approximately $105 million for all of its assets. TPLC also has a $25 million liability policy. This policy is a diminishing policy; that is defense costs are deducted from the total coverage. TPLC has depleted approximately $9 million of their insurance coverage to cover legal fees and medical monitoring expenses. Thus, TPLC currently has approximately $120 million in assets and insurance to cover its liabilities related to the "J" lead litigation.[10]

In the United States, an estimated 25,000 individuals have had the "J" Lead implanted. Dividing $120 million by the number of implantees, TPLC has about $4800 to spend on each of the implantees for medical monitoring and any potential damage awards. TPLC has spent over $2.5 million on medical monitoring since it agreed to pay for the reasonable unreimbursed expenses of fluoroscopy and explantation. Because the Parties did not submit evidence regarding the potential cost of the medical monitoring program, the Court cannot determine whether TPLC faces insolvency as a result its expenses arising out of the "J" lead controversy. The possibility of the existence of a limited fund, however, lends further support to a conclusion that medical monitoring class should be certified under Rule 23(b)(1).

### C. Class Certification of Medical Monitoring pursuant to Rule 23(b)(3).

▉ In addition, we note that a medical monitoring subclass also satisfies Rule 23(b)(3). Rule 23(b)(3) has two primary requirements: (1) that common issues predominate over individual issues, and (2) class treatment is superior to other methods of adjudication.

First, TPLC's defense to Plaintiffs' medical monitoring claim clearly predominates over any individual issues raised by the medical monitoring claims. TPLC acknowledges that all "J" lead implantees require medical monitoring to prevent injury due to fracture. Telectronics' primary defense to Plaintiffs' claims for additional or different medical monitoring than that offered by TPLC is that its medical monitoring program has been approved by the FDA and is the best program available under present research and technology. This defense is common to all implantees and is the predominant issue regarding the appropriateness of a court ordered medical monitoring program. *See Jenkins v. Raymark Industries,* 782 F.2d 468, 472 (5th Cir.1986) ("In order to 'predominate,' common issues must constitute a significant part of the individual cases."); *In re "Agent Orange" Product Liability Litigation,* 100 F.R.D. 718 (E.D.N.Y.1983) (finding common issues predominated where critical defenses affected all class members equally).

▉ Second, class certification of a medical monitoring class is also the superior method of dealing with the medical monitoring claims. As pointed out in our discussion of Rule 23(b)(1), there is risk that TPLC could be ordered to conduct conflicting medical monitoring programs if individual implantees pursue medical monitoring claims in separate actions. In addition, practically speaking, for many of the "J" Lead recipients their only realistic claim may be for medical monitoring. This is not the type of claim that is likely to lead to large damage

---

**10.** Plaintiffs have also sued TPLC's parent companies, Pacific Dunlop Limited and Nucleus Limited. Plaintiffs have not moved to certify a class action against these defendants. Furthermore, there is a substantial question whether Pacific Dunlop or Nucleus can be held liable for the activities of their subsidiary, TPLC.

awards. While TPLC has to its credit instituted a significant medical monitoring program, Plaintiffs have every right to challenge the adequacy of this program. Thus, it appears that many of the proposed class members have small monetary claims that would be difficult to pursue in individual actions. *See In re Copley Pharmaceutical, Inc.*, 161 F.R.D. 456, 466 (D.Wyo.1995) (finding that decertification of class involving relatively small claims would "slam" the courthouse door shut for many plaintiffs). The superiority prong of Rule 23(b)(3) is satisfied if aggregation of small monetary claims is required to ensure vindication of legal rights. *See Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 185 (N.D.Ill.1992) (finding plaintiffs had satisfied superiority prong in part because many class members had claims which would be uneconomical to pursue individually); *Wehner v. Syntex Corp.*, 117 F.R.D. 641, 645 (N.D.Cal.1987) (finding class action superior where "[i]n practical terms, plaintiffs ... may be economically precluded from bringing separate lawsuits and thus be barred access to the judicial system.").

Defendants counter that class certification of a medical monitoring subclass is unmanageable in light of the variations in state law of medical monitoring. We disagree. TPLC acknowledges that all implantees require medical monitoring. The critical questions are whether the present monitoring program is adequate and whether Telectronics will be required to continue it. Thus, most variations in state law regarding medical monitoring are immaterial.

One major distinction in the law of medical monitoring is relevant in this situation. In some states, medical monitoring is only recoverable if the plaintiff shows physical injury. *See e.g., Ball v. Joy Technologies, Inc.*, 958 F.2d 36, 39 (4th Cir.1991) (applying West Virginia and Virginia law). Without a fracture of the "J" Lead, class members in those states may be unable to pursue claims for monitoring even though TPLC concedes that monitoring is required. Thus, pursuant to Rule 23(c)(4), the Court will divide the medical monitoring class into two subclass: (1) implantees from states that do not require present physical injury to recover for medical

monitoring, and (2) implantees from state that require present physical injury in order to recover for medical monitoring.

## IV

### A. Negligence and Strict Liability Subclasses and Rule 23(b)

Pursuant to the Sixth Circuit's directive in *In re American Medical Systems* to take into account the variations in state law, Plaintiffs now propose two negligence subclasses and three strict liability subclasses.

In Part II, we found that the negligence and strict liability subclasses satisfied the requirements of Rule 23(a). Now, we must determine if the negligence and strict liability subclasses satisfy the requirements of one of the subsections of Rule 23(b). Both the negligence and strict liability claims are primarily actions for damages which are generally certified pursuant to Rule 23(b)(3). *See In re Asbestos School Litigation*, 104 F.R.D. 422, 438 (E.D.Pa.1984) (recognizing that actions for damages are best certified under Rule 23(b)(3)).

■ Rule 23(b)(3) has two primary requirements: (1) that common issues predominate over individual issues, and (2) class treatment is superior to other methods of adjudication. Fed.R.Civ.P. 23(b)(3). Rule 23(b)(3) parallels Rule 23(a)(2) in that both subdivisions require that common issues exist, but 23(b)(3)'s predominance test goes further by insuring that the common issues predominate over individual issues. *American Medical Systems*, 75 F.3d at 1084. The inquiry is mainly a pragmatic one: do the common issues justify a common adjudication? Wright et al., 7A *Federal Practice and Procedure*, § 1778.

### B. Do Common Issues Predominate?

■ That common issues predominate over individual issues does not require that the class members' claims be proven by identical evidence or that individualized proof cannot be introduced on some issues.

No matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the

question of liability tried as a class action. Consequently, the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible.

*Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1196–97 (6th Cir.1988); *see also In re American Medical Systems*, 75 F.3d at 1084 (quoting *Sterling* with approval). Generally, mass tort accidents are appropriate for resolution on a class-wide basis because the cause of the accident is a single course of conduct. "[W]here the defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy." *Sterling*, 855 F.2d at 1197. Numerous courts have found that common issues predominate when a large number of lawsuits arise from a single disaster or single course of conduct. *See e.g., Sterling*, 855 F.2d at 1197 (certifying class of people exposed to contaminated water); *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1023 (5th Cir.1992) (approving a class of individuals injured in an oil refinery explosion), *reh'g granted*, 990 F.2d 805 (5th Cir.1993), *appeal dismissed*, 53 F.3d 663 (5th Cir.1994); *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145 (2d Cir.1987) (certifying class of service people exposed to the herbicide Agent Orange while in Vietnam).

The Sixth Circuit in *American Medical Systems*, however, found that products liability actions differed from mass tort cases because products liability cases usually involve factual and legal issues that vary dramatically from individual to individual. 75 F.3d at 1084. Nevertheless, the Sixth Circuit did not close the door on product liability class actions but instead held that district courts must exercise great care before certifying such a class. *Id.* at 1089 ("This is not to say that a class action in [medical product liability/personal injury cases] will never be appropriate, but it is to say that strict adherence to Rule 23 in products liability cases involving ... medical products which require FDA approval is *especially* important.") (em-phasis in original) (footnote omitted) (citation omitted).

The issues common for all of the negligence and strict liability claims are whether TPLC negligently designed or manufactured the "J" Leads or whether TPLC's "J" Leads are defective. Both issues seek to resolve whether TPLC is legally responsibly for the "J" Lead fractures.

The "J" Lead controversy appears to be the exception to the general rule that medical products liability actions require extensive proof of individualized issues.. This case does not involve many of the factual and legal complications which prevented certification in other medical products liability actions. First, this case involves two nearly identical pacemaker leads manufactured by one company. *Compare In re Copley Pharmaceutical, Inc.*, 158 F.R.D. 485 (D.Wyo. 1994) (certifying class involving one product manufactured by one defendant), *with In re American Medical Systems*, 75 F.3d at 1085 (finding class action involving ten different penile implant models did not satisfy predominance prong); *Georgine v. Amchem Prods.*, 83 F.3d 610, 626 (3d Cir.1996) *cert. granted*, —— U.S. ——, 117 S.Ct. 379, 136 L.Ed.2d 297 (1996) (decertifying in part because "[t]he class members' claims vary widely in character. Class members were exposed to different asbestos-containing products for different amounts of time, in different ways, over different periods of time."), *and Castano v. American Tobacco Co.*, 84 F.3d 734, 742–43 n. 15 (5th Cir.1996) ("The *Castano* class suffers from many of the difficulties that the *Georgine* court found dispositive. The class members were exposed to nicotine through different products, for different amounts of time, and over different time periods."). Second, Plaintiffs all allege one defect—a potential for or actual fracture of the retention wire. *Cf. In re American Medical Systems*, 75 F.3d at 1085 (finding common issues did not predominate in product liability action where class members alleged multiple defects with their product). Third, in traditional medical product liability situations, causation is often the overarching issue that requires extensive individualized proof; the same is not true in this situation.

Telectronics insists that there could be multiple reasons why the "J" Leads fracture, such as doctor error in the implantation. However, it is important for the Court to "probe behind the pleadings" of a party's claim or defense in order to determine whether the predominance and superiority requirements are satisfied. *In re American Medical Systems*, 75 F.3d at 1087; *see also Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978) ("[T]he class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'"); Charles A. Wright et al., 15 *Federal Practice and Procedure* § 3911, p. 485 n. 45 (1976) ("Evaluation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims. The typicality of the representative's claims or defenses, the adequacy of the representative, and the presence of common questions of law or fact are obvious examples. The more complex determinations required in Rule 23(b)(3) class actions entail even greater entanglement with the merits....").

The factual context of this products liability action indicates that a single course of conduct—the manufacture or design of the "J" Lead—is probably the reason for the "J" Lead fractures. Telectronics, recognizing a generalized problem with the "J" Lead retention wires, recalled all of the unimplanted leads in 1994. Soon thereafter, the FDA found that the "J" Leads present an unreasonable danger to the public health. It seems unlikely that the FDA would make such a finding if a post-production intervening cause was responsible for the significant rate of fracture of the "J" Leads. Finally, the sheer magnitude of the rate of fracture as detected by Telectronics' studies [11] undermines the possibility that external forces such as doctor error are the reason for the fractures. These factors would seem to indicate that a common failure likely befalls all of the devices.

Therefore, the most significant common issue which predominates in this action is whether TPLC is legally responsible for the fractures. *See Sterling*, 855 F.2d at 1197 ("[W]here the defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy.").

Moreover, any individual issues of causation are likely to be straightforward and easily resolvable so as not to defeat predominance. Whether a fractured lead injured an individual implantee is a much simpler inquiry than in many medical products liability actions because it involves a direct and immediate wound to the body versus a latent, difficult to diagnose disease. For example, general resolution of the question whether a certain drug causes cancer or birth defects does little to determine if an individual's cancer was caused by the drug. This individual causation question tends to be the overarching issue in these cases, and it overshadows other less complex issues and precludes the common issues from predominating. *See e.g., Mertens v. Abbott Laboratories*, 99 F.R.D. 38 (D.N.H.1983).

In *Mertens*, the court faced the issue of causation in the context of a product which allegedly causes a latent disease. The court concluded that common issues could not predominate because resolution of the common issues would do little to resolve the litigation. *Id.* at 41.

In a sense, Plaintiffs would have the question of global liability be the predominant one in this litigation. They seek a blanket determination that DES causes injury to a female in utero, and believe that this common issue predominates over any questions affecting only individual class members. The telling inquiry is what would such a determination do to advance the cause of the class members as a group?

It is this Court's view that a mere finding that DES causes injury in utero would do substantially nothing to advance the common cause of class members. In light of the varied degrees of use, exposure and harm in each Plaintiff's case, a determina-

---

11. Separate studies have found between 12% and 25% of the "J" Leads surveyed had fractures.

tion in principle would serve no useful purpose in resolving the individual claims made in this action. Although common questions need not be dispositive of the entire class action, their resolution should at least provide a definite signal of the beginning of the end. This is not the type of litigation, however, that lends itself to establishing a global result that a product causes harm with the details merely to be tidied up thereafter. The importance of the "details" in each individual claim would clearly outweigh the single outweigh the single determination that DES causes injury.

*Id.* at 41–42. The injury caused by a "J" Lead fracture is significantly different. The injury caused by a fractured retention wire is an obvious physical wound to the body of the implantee. Thus, while causation will require individualized proof, it will not be the predominant issue because whether a fracture caused an individual's injury is question that is easily resolved.

The other individual issues—whether an individual implantee's retention wire has fractured and what are the individual's damages—do not preclude class certification. Whether a particular individual's lead has fractured is easily resolved because a fracture is detectable by a fluoroscope. The damage issue, although requiring individualized proof, does not preclude class certification. *Sterling,* 855 F.2d at 1197 ("[T]he mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible."). Therefore, we find common issues predominate.

### 1. Is Class Treatment Superior?

"That common question predominate is not itself sufficient to justify a class action under subdivision (b)(3) for another method of handling the litigious situation may be available which has greater practical advantages." Fed. R. Civ. Pro. 23, Advisory Committee Note. Plaintiffs must also demonstrate that this litigation would be superior to all other methods of litigation. Fed.R.Civ.P. 23(b)(3). "[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of settling the controversy...." Wright, supra, 7 *Federal Practice & Procedure,* § 1780 at 562. "The rule asks us to balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." *Georgine,* 83 F.3d at 632 (citation omitted).

Rule 23(b)(3) identifies four factors which should be examined by the court to determine whether class treatment would be fair and efficient.

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. Rule 23(b)(3)(A)-(D). Efficiency and economy are factors in favor of certification under the superiority prong. Here, because it appears likely that there is a single cause of the "J" Lead fracture,[12] a single determination of causation would efficiently resolve a large issue in this case for all class members. This conclusion, however, is not enough to find class treatment the superior method of dealing with the "J" Lead cases.

Several recent circuit court decisions have focused upon the fourth factor as a possible roadblock to class certification in diversity actions. *See e.g., In re American Medical Systems Inc.,* 75 F.3d at 1085 (noting that district judge failed to consider how state law variations would affect the appropriateness of class treatment). Thus, in order to demonstrate that a class action is superior to other forms of litigation in the context of diversity based actions, Plaintiffs

---

**12.** See discussion *supra* Part IV B.

must show that such an action is manageable in light of state law variations. *Castano*, 84 F.3d at 741.[13]

In our Decertification Order, we found that Plaintiffs had failed to make such a showing. We held that Plaintiffs must come forward with the exact definition of subclasses, their representatives, and the reasons each subclass meets the prerequisites of Rule 23(a) and (b). Furthermore, the variations prerequisites of Rule 23(a) and (b). Furthermore, the variations in state law must guide Plaintiffs' creation of subclasses.

### 1. Negligence Subclasses

Taking into account the state law variations regarding negligence, Plaintiffs have divided the subclasses to reflect the forty-six jurisdictions that permit the introduction of state-of-the-art evidence [14] and the two jurisdictions which do not.[15]

Plaintiffs state that forty-seven jurisdictions permit plaintiffs in product liability actions to bring negligence claims.[16] Plaintiffs assert that all states that recognize negligence as a cause of action in a products liability action apply the same elements to determine liability: duty, breach, causation, injury and damage. *See e.g.*, *Riley v. Warren Mfg., Inc.*, 688 A.2d 221, 224 (Pa.Super.1997) ("In establishing a cause of action in negligence, plaintiffs bear the burden of demonstrating that there was a duty or obligation recognized by law, breach of that duty by the defendants, a causal connection between the defendants' breach of that duty and the resulting injury, and actual loss or damage suffered by the complainants."). Not only do all states use the same elements to define a cause of action for negligence, many of those states look to the same source for a standard in products liability cases. *See* Restatement (Second) of Torts § 395 and Appendix (cited with approval by courts in thirty-six states); *see e.g.*, *Morris v. Chrysler Corp.*, 208 Neb. 341, 303 N.W.2d 500, 502 (1981); *Clark v. International Harvester Co.*, 99 Idaho 326, 581 P.2d 784, 791 (1978); *Hartmon v. National Heater Co.*, 240 Minn. 264, 60 N.W.2d 804, 810 (1953) ("Although the parties differ in their application of the law to the facts presented, there is no substantial dispute between them as to the principles of law applicable to this case.") (citing Restatement (Second) of Torts § 395).

As discussed earlier, the predominant issue to be decided in this case is whether TPLC is legally responsible for the "J" Lead fractures. A major element of that question is whether state law provides an defense because the product was designed, inspected, tested, labeled or produced with the with the best knowledge and technology reasonably available at the time. *See* Stuart M. Spieser, 6 *The American Law of Torts*, § 18:165 at 338 (1989); *Beshada v. Johns–Manville*

---

**13.** Plaintiffs argue that this Court could apply one state's law to all of the class members' claims under Ohio choice-of-law rules. There is some support for Plaintiffs' conclusion. *See In re Bendectin Litigation*, 857 F.2d 290, 303–05 (6th Cir.1988) (approving district court's choice of the law from the state of manufacture, under Ohio choice-of-law rules, in products liability actions consolidated for trial from across the country). We, however, question the correctness of that ruling and further question the continuing validity of that holding in light of the Sixth Circuit's later ruling in *In re American Medical Systems*. Accordingly, in an abundance of caution, we will presume the law of the state of residence of individual class members would apply to those claims. If at some later point, the Court finds that one state's law will apply to all class members' claims, the appropriateness of class certification will be more readily apparent.

**14.** Subclass Two would represent "J" Lead implantees who reside in states that permit a cause of action for negligence in a product liability action and which allow the introduction of the state-of-the-art evidence. Subclass Two would include residents from states of Alabama, Alaska, Arizona, Arkansas, California, Connecticut, Delaware, District of Columbia, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South West Virginia, Wisconsin and Wyoming.

**15.** Subclass Three would be made up of "J" Lead implantees residing in states that do not allow the introduction of state-of-the-art evidence. Subclass Three would include residents from the states of Hawaii and Pennsylvania.

**16.** Defendants point out that in fact forty-eight jurisdictions recognize a cause of action under negligence in a products liability action.

*Products Corp.*, 90 N.J. 191, 447 A.2d 539, 544 (1982) ("Essentially, state-of-the-art is a negligence defense. It seeks to explain why defendants are not culpable for failing to provide a warning. They assert, in effect, that because they could not have known the product was dangerous, they acted reasonably in marketing it without a warning.").

TPLC counters that just because those jurisdictions all recognize a cause of action in negligence in a products liability case does not mean that the law of negligence is universal. TPLC insists that the law of negligence is too diverse to certify a nationwide products liability class action. TPLC argues that Plaintiffs have failed to properly consider all of the nuances of state law in defining its proposed subclasses. Finally, TPLC argues that the Court cannot decide for itself that any difference are insignificant. Presumably, this means that the Court may not, in essence, overlook these differences, no matter how slight, and certify a class which contains implantees from states whose pattern jury instruction are not identical.

We disagree. Our directive from the Sixth Circuit is to "consider how the law of negligence differs from jurisdiction to jurisdiction . . ." before determining whether class certification is appropriate. *In re American Medical Systems,* 75 F.3d at 1085. Obviously, that implies that the Court must make an evaluation to determine which variances are important or substantial enough to preclude class certification or require subclasses.

First, state law does not need to be universal in order to justify nationwide class certification.

Secondly, while it is certainly true that state tort law varies, the question under the superiority prong of Rule 23(b)(3) is can the relevant variations be dealt with in a simple and efficient manner. It seems certain though that only particular nuances should be relevant to the question of class certification. The Court must make a careful inquiry to determine which variations might impede class certification. Obviously, the Court will have to determine whether the variations are significant and whether they are material to the issues contested in the case. In other words, are there nuances in the state law at issue in the case which must be addressed in order to satisfy *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). It seems that the Court has three options in making this inquiry: (1) find that state law is sufficiently similar that a single class is appropriate, (2) find that the state law varies so much that class certification is inappropriate, or (3) find that state law variations can be categorized and then divided into subclasses.

Thus, if the elements of the cause of action are the same and the legal standards on "important/meaningful/significant/pivotal" issues are substantial similar the state laws can be grouped for purposes of class certification. In looking at the nuances of state law, it is important to distinguish between nuances that are pertinent to the issues being certified and those which are unimportant to these questions.

Specifically, TPLC argues that the use of the term "proximate cause" varies from state to state. For example, California and Oklahoma no longer use the term "proximate cause" in jury instructions in negligence cases. On the other hand, TPLC asserts that Georgia and Nebraska require the trial court to instruct the jury on proximate cause.

While we might agree that these variations in language are technically "nuances" in state law, minute and insignificant differences cannot preclude class certification or else no class could ever be certified in this context. *See In re AMS,* 75 F.3d at 1089 (rejecting proposition that diversity based products liability actions are never appropriate for class certification). Upon review of the case law and pattern jury instructions from the various states, we find this a distinction without a difference. Some states may have done away with the use of the term "proximate cause," but those states still instruct juries on the concept of legal causation. While we agree that some states, for example Georgia, mandate that trial courts instruct juries on the meaning of proximate cause, the real point to these cases is not the term "proximate" but the concept of legal causation. As the Georgia Supreme Court later explained regarding the holding of *Cline,* the need for an instruction on proximate cause is because

causation is a necessary element of any decision on liability. *Dietz v. Becker*, 209 Ga. App. 678, 434 S.E.2d 103, 106 (1993).

However, the record is likewise abundantly clear that the primary issue to be decided by the jury in this case was whether the injuries for which plaintiffs sought recovery were sustained in the collision with Becker, or whether plaintiffs' alleged injuries existed prior to this collision. " 'It is basic in our law that no liability attaches unless the negligence alleged is the proximate cause of the injury sustained.' *Cline v. Kehs*, 146 Ga.App. 350, 246 S.E.2d 329 (1978)." *Dilworth v. Boeckler*, 187 Ga.App. 241, 370 S.E.2d 17, 18 (1988). Since the grant of a directed verdict on the issue of "liability" necessarily includes a determination of both negligence and causation, *id.*, and since the central issue in this case was the proximate cause of the injuries alleged, we find no error in the trial court's denial of plaintiffs' motions for directed verdict.

*Id.* 434 S.E.2d at 106.

Likewise, states that have eliminated use of the term "proximate cause" still retain causation as an essential element of a negligence action. Often, the deletion of the term "proximate cause" is merely a cosmetic change in the state's law or jury instructions. Oklahoma provides a clear example of this superficial change associated with ending the use of the term "proximate cause." Oklahoma substituted the term "direct cause" for proximate cause in its instruction on the elements of negligence. In reality, the change was merely a change in the name of legal causation and made no substantive alteration in Oklahoma negligence law.

The Committee considers the word "proximate" in these instructions to be of virtually no assistance to a jury. The earlier Oklahoma Bar Committee on Uniform Instructions (1969) recommended "proximate" be dropped and cause not be defined. Kansas allows either "proximate cause" or "direct cause." Missouri used "direct result" and Minnesota "direct cause." In order *not to change the Oklahoma requisites of legal cause*, the Committee recommends an instruction consistent with the traditional definition of proximate cause, using instead the adjective "direct" (See Instruction 9.6, "Direct Cause—Definition"). In W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 42 at 273 (5th ed.1984), the authors state, "The term 'proximate' is a legacy of Lord Chancellor Bacon, who in his time committed other sins." The Committee believes Oklahoma juries should be at last relieved of his Lordship's indiscretion.

OUJI 2d § 9.1, Comment (emphasis added).

We find that the differences in state law regarding "proximate cause" instructions are insignificant, and therefore, they present no hurdle to class certification on negligence classes proposed by Plaintiffs.

**2. Superiority and Strict Liability Subclasses**

Plaintiffs divide the strict liability issue into subclasses in order to take into account the variations in state law. Plaintiffs assert that forty-six jurisdictions recognize some form of strict liability in products liability actions. Plaintiffs contend that thirty-two jurisdictions follow the version of strict liability outlined in the Restatement (Second) of Torts § 402A. Plaintiffs assert that eleven states apply a modified version of § 402A which incorporates some elements of negligence into the strict liability formulation. Finally, three states follow the California Supreme Court decision in *Greenman v. Yuba Power Products*, 59 Cal.2d 57, 27 Cal. Rptr. 697, 700, 377 P.2d 897, 900 (1963), which held that the plaintiff need only show that the product was defective.

In addition to the various formulations of strict liability, as with the negligence subclasses, Plaintiffs subdivide the strict liability claims under § 402A on the basis of whether the state allows introduction of state of the art evidence. Plaintiffs further subdivide the modified § 402A jurisdictions on the basis of whether the jurisdiction requires proof that the product was either defective, unreasonably dangerous or both.

The Court has reviewed the subclass distinctions and finds that they adequately account for variations in the state law of strict

liability. Plaintiffs have created subclasses which sufficiently take into account state law variations in the law of strict liability.

Telectronics insists that these classifications are insufficient because there are substantial differences in state law language defining "unreasonably dangerous." For example, both New York and Tennessee are in Subclass 6, sub-subclass B. In New York, a manufacturer is liable for a product that is "not reasonably safe." *Voss v. Black & Decker,* 59 N.Y.2d 102, 463 N.Y.S.2d 398, 450 N.E.2d 204, 208 (1983). In Tennessee, a manufacturer is liable for a product that is "defective or unreasonably dangerous." Tenn.Code. Ann. § 29–28–105 (1994). We agree with Telectronics that these slight variations in language make a difference in the impact of the law. However, we agree with Plaintiffs that these types of variations can be managed with proper jury instructions.

Other variations pointed out by Telectronics are either insignificant or irrelevant to the issues presented in this case. For example, Telectronics asserts that Plaintiffs failed to analyze how states deal with compliance with federal regulations. In this instance, this variation is likely to be immaterial because the Supreme Court recently found the FDA "regulations" under which the "J" Lead was allowed to proceed to market does not provide protection to the public. *See Medtronic v. Lohr,* —— U.S. ——, ——, 116 S.Ct. 2240, 2254, 135 L.Ed.2d 700 (1996) (holding that FDA's "substantial equivalence" doctrine does not preclude state law claims because the approval process did not involve safety and thus provide little protection to the public). Accordingly, we find that the strict liability subclasses satisfy the requirements Rule 23(b)(3).

## V

### PUNITIVE DAMAGES

▮ We previously denied certification of a punitive damages class because we found that punitive damages, like compensatory damages, must be measured individually based upon the facts and local law. We find here that the proposed punitive damages subclasses fail to satisfy Rule 23(b). Plaintiffs have failed to take into account adequately the multiple variations in the law of punitive damages. The law of punitive damages has undergone significant change in the last couple of years. In many instances, state legislatures have stepped in and imposed varying procedures for the imposition of punitive damages. State law also evidences substantial variances in standards of conduct and proof. A further complication arises because some states that apply a similar standard of conduct sometimes require different standards of proof. For example, both Arkansas and Alabama require a showing of willful or wanton conduct in order to award punitive damages. *James v. Bill C. Harris Constr. Co.,* 297 Ark. 435, 763 S.W.2d 640, 642 (1989) (punitive damages may be awarded when the evidence indicates that "'the defendant acted wantonly in causing the injury or with such a conscious indifference to the consequences that malice might be inferred.'") (quoting *Freeman v. Anderson,* 279 Ark. 282, 651 S.W.2d 450, 452 (1983)); Ala.Code § 6–11–20(a). Consequently, Plaintiffs group Alabama and Arkansas in Subclass Eight. These two states, however, require different standards of proof. In Alabama, Plaintiff must prove punitive damages are recoverable clear and convincing evidence. Ala.Code § 6–11–20(a). In Arkansas, punitive damages are recoverable upon by preponderance of the evidence. *Dun & Bradstreet Inc. v. Nicklaus,* 340 F.2d 882 (8th Cir.1965). Plaintiffs' proposed Subclass Eight includes both states.

It is not appropriate to group together in one subclass implantees from states whose laws provide for different standards of proof. Any attempt to do so would make it nearly impossible to properly instruct a jury and would be hopelessly confusing to the jury. This is merely one example of the complications in attempting to accommodate state law variations on punitive damages.

Thus, we are not convinced that Plaintiffs have shown that class certification is the superior method of dealing with the punitive damages claim. Accordingly, the Court DENIES certification of any punitive damages subclasses at this time.

However, the Court contemplates conducting a summary jury trial before the trial on the merits [17] in hopes of encouraging the Parties to settle this litigation, possibly in a fashion similar to the settlement reached in *Bowling v. Pfizer*, 143 F.R.D. 141 (S.D.Ohio 1992). We may submit the question of punitive damages to the summary jury through a series of interrogatories reflecting the different standards and burdens of proof. Following the summary jury trial we may revisit the question whether punitive damages should be certified for class action treatment.

## VI.

### CONCLUSION

Accordingly, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' Renewed Motion for Class Certification. The Court hereby Certifies subclasses for Medical Monitoring, Negligence and Strict Liability as outlined in the Appendix to this Order. The Court, however, does not certify any punitive damage subclasses.

SO ORDERED.

---

**17.** The court has found that summary jury trials are often instrumental in expediting settlement in large complex actions. *See e.g., In Re Southern* *Ohio Correctional Facility*, C–1–93–436, and *Cincinnati Gas & Electric Co. v. General Electric, Co.*, C–1–84–988.