253 F.3d 1180 (9th Cir. 2001)
 ROBIN ZINSER, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, PLAINTIFF-APPELLANT,
v.
ACCUFIX RESEARCH INSTITUTE, INC., FORMERLY D.B.A. AS TPLC, INC., AND TELECTRONICS PACING SYSTEMS, DAD NOW KNOWN AS TPLC HOLDINGS, INC., A COLORADO CORPORATION; PACIFIC DUNLOP LIMITED, AND NUCLEUS LIMITED; NUCLEUS LIMITED, DEFENDANTS-APPELLEES.
 No. 99-17073
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted October 30, 2000
Filed June 15, 2001
Amended December 14, 2001
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 Elizabeth J. Cabraser, James M. Finberg (argued), Melanie M. Piech, and Scott P. Nealey, Leiff, Cabraser, Hiemann & Bernstein, Llp, San Francisco, California; C. Brooks Cutter, Friedman, Callard, Cutter & Panneton, Sacramento, California; Robert Hollingsworth, Cors & Bassett, Cincinnati, Ohio, for the plaintiff-appellant.
 Charles F. Preuss, Thomas J. Pulliam, Jr., and Catherine W. Levin, Preuss, Walker & Shanagher, Llp, San Francisco, California; Charles P. Goodell, Jr. (argued), Richard M. Barnes, and Ian Gallacher, Goodell, Devries, Leech & Gray, Llp, Baltimore, Maryland; John M. LaPlante, Gregory J. Fisher, Edson & LaPlante, Sacramento, California; Patrick S. Coffey, Scott J. Fisher (argued), Gardner, Carton & Douglass, Chicago, Illinois; Robert S. Epstein, Epstein, Englert, Staley & Coffey, San Francisco, California, for defendantsappellees.
 Appeal from the United States District Court for the Eastern District of California Garland E. Burrell, Jr., District Judge, Presiding D.C. No. CV-97-0414-GEB
 Before: Betty B. Fletcher, Diarmuid F. O'Scannlain, and Ronald M. Gould, Circuit Judges.
 
 
 1
 The opinion of the court was delivered by: Gould, Circuit Judge
 
 
 2
 Opinion by Judge Gould; Dissent by Judge B. Fletcher
 
 OPINION
 
 3
 This is a products liability action involving pacemakers containing the allegedly defective ENCOR Bipolar Passive Fixation Pacing Lead Model 330-854 ("854 lead"). Plaintiff-Appellant Robin Zinser ("Zinser") filed a class action complaint alleging negligence, products liability, negligent misrepresentation, fraud and deceit, breach of express warranty, breach of implied warranty, and infliction of emotional distress against defendant Accufix Research Institute ("ARI"), formerly Telectronics Pacing Systems. Zinser also alleged that defendants Pacific Dunlop Limited ("Pacific Dunlop") and Nucleus Limited ("Nucleus") were derivatively liable for damages caused by ARI.
 
 
 4
 The district court denied class certification, holding that Zinser failed to meet her burden of proving that a class should be certified pursuant to Federal Rule of Civil Procedure 23 ("Rule 23") (b)(1)(A), (b)(1)(B), (b)(2), or (b)(3). Zinser appeals, and we affirm.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 5
 Pacemakers containing the 854 lead were implanted in a population of 10,549 patients in 48 states throughout the United States. Approximately 8,200 of these patients were still alive and implanted with an 854 lead when the district court considered class certification.
 
 
 6
 ARI designed, manufactured, and distributed the 854 lead. Pacific Dunlop is an Australian company and the ultimate parent and beneficial owner of ARI. Nucleus, another Australian company, is a wholly-owned subsidiary of Pacific Dunlop and also holds an indirect beneficial ownership interest in ARI.
 
 
 7
 A pacemaker consists of two parts: a pulse generator and one or two atrial leads. Because most atrial leads included in pacing systems are placed in the upper portion of the atrium, which is difficult to reach, many atrial leads are manufactured with a pre-existing "J" shape to help physicians stabilize the lead. The 854 lead consists of a polyurethane insulated conductor coil formed into its "J" shape through the use of a flat metal retention wire, which runs through the inside of a conductor coil. While implanted, the lead flexes and bends each time the heart beats, approximately 100,000 to 150,000 times per day.
 
 
 8
 Because of metal fatigue, the "J" retention wire may fracture over time. Whether a "J" wire in an 854 lead will fracture depends, in part, on whether the wire has suffered bends or kinks in the interelectrode region. Injury from a"J" wire in an 854 lead has been reported only when the wire fractures and protrudes through a small section of the tip of the lead in the interelectrode region.
 
 
 9
 On September 11, 1995, ARI published a "Dear Doctor" letter announcing its withdrawal of all models of passive fixation atrial "J" leads. The letter also advised physicians of new safety information related to its ENCOR 330-854 and ENCOR DEC 033-856 leads.[1] To date, ARI has issued a total of five "Dear Doctor" letters setting forth relevant clinical information and patient management guidelines. Individuals from the worldwide implant population have reported a total of five injuries related to fracture and protrusion of the 854 lead "J" wire, two of which occurred in the United States. Additionally, four patients in the United States have reported non-specific chest pain with an unconfirmed relationship to "J" wire fracture or protrusion.
 
 
 10
 ARI communicated the current lead patient management guidelines to the medical community on August 14, 1998. ARI recommended: (1) annual fluoroscopic screening for all patients implanted with 854 leads; (2) fluoroscopic screening every six months if a physician finds that a lead is fractured proximal to the anode band; (3) fluoroscopic screening every six months or consideration of extraction if fluoroscopic screening reveals that a lead is fractured or kinked within the interelectrode region; and (4) consideration of extraction if fluoroscopic evidence indicates that the "J" wire is protruded or severed within the interelectrode region. ARI maintains that the risk of extraction is greater than the risk of injury from a "J" wire protrusion.
 
 
 11
 ARI has previously faced litigation involving three different pacemaker leads, known as ACCUFIX atrial "J " lead models 330-801, 329-701, and 088-812 ("Telectronics litigation"). The Telectronics litigation's procedural history includes certification, decertification, and recertification by the district court of a class against ARI. See In re Telectronics Pacing Systems, Inc., 164 F.R.D. 222 (S.D. Ohio 1995) (certifying class pursuant to Rule 23(b)(3)); 168 F.R.D. 203 (S.D. Ohio 1996) (on reconsideration, decertifying class); 953 F. Supp. 909 (S.D. Ohio 1997) (denying Pacific Dunlop and Nucleus' motion to dismiss for lack of jurisdiction); 172 F.R.D. 271 (S.D. Ohio 1997) (recertifying class). After the parties to the Telectronics litigation reached a settlement agreement, Zinser moved to intervene, arguing that she might make a claim against monies allocated to the settlement class on behalf of the putative class in this case. The district court presiding over the Telectronics litigation denied the motion as untimely.[2]
 
 
 12
 On August 11, 1997, Zinser filed a putative class action complaint against ARI alleging negligence, products liability, negligent misrepresentation, fraud and deceit, breach of express warranty, breach of implied warranty, and infliction of emotional distress. Zinser also alleged that Pacific Dunlop and Nucleus, as parent corporations, were derivatively liable for damages caused by ARI.
 
 
 13
 Zinser sought class certification only for claims of negligence, products liability, and medical monitoring pursuant to Rule 23. Zinser defined the proposed class as:
 
 
 14
 All persons domiciled or residing in the United States of America and its territories, possessions, and the District of Columbia, who had implanted in their bodies, an ENCOR Bipolar Passive Fixation Pacing Lead Model 330-854. Excluded from the class are the defendant's officers and employees.
 
 
 15
 Zinser also sought certification of two subclasses:
 
 
 16
 The first subclass (the "Medical Monitoring Subclass") is composed of those individuals who are currently implanted with a model 330-854 pacing lead. The second subclass (the "Explantation Subclass") is composed of those individuals who have had a model 330-854 lead removed because of an actual injury or risk of injury.
 
 
 17
 The district court denied Zinser's request for class certification pursuant to Rule 23(b)(1)(A), (b)(1)(B), (b)(2), and (b)(3). Because of the procedural complexity of trying a class action under the laws of multiple jurisdictions, the district court refused to certify the class pursuant to Rule 23(b)(3). The district court denied certification of the proposed Rule 23(b)(1)(A) medical monitoring subclass, finding that individual adjudications of the medical monitoring claim would not expose ARI to conflicting obligations. The court also rejected certification of the subclass pursuant to Rule 23(b)(2), finding that the nature of the relief sought was primarily legal, not equitable, in nature. And the court refused to certify the class pursuant to Rule 23(b)(1)(B) as a limited fund. Because the Rule 23(b) requirements were dispositive, the district court declined to consider whether Zinser met the requirements of Rule 23(a).
 
 
 18
 On September 27, 1999, we exercised our discretion pursuant to Rule 23(f) and granted Zinser permission to appeal the district court's order denying class certification. Pursuant to 28 U.S.C. §§ 1292(e) and Rule 23(f), we have jurisdiction over Zinser's appeal.
 
 DISCUSSION
 I.
 
 19
 Class actions are governed by Federal Rule of Civil Procedure 23. As the party seeking class certification, Zinser bears the burden of demonstrating that she has met each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). Hanon v. Dataproducts Corp. , 976 F.2d 497, 508 (9th Cir. 1992).[3]
 
 
 20
 Before certifying a class, the trial court must conduct a "rigorous analysis" to determine whether the party seeking certification has met the prerequisites of Rule 23. Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1233 (9th Cir. 1996). While the trial court has broad discretion to certify a class, its discretion must be exercised within the framework of Rule 23. Doninger v. Pacific Northwest Bell, Inc., 564 F.2d 1304, 1309 (9th Cir. 1977). "We review a district court's denial of class certification for abuse of discretion." Knight v. Kenai Peninsula Borough Sch. Dist., 131 F.3d 807, 816 (9th Cir. 1997).
 
 
 21
 Our circuit has recognized the potential difficulties of "commonality" and "management" inherent in certifying products liability class actions. In re N. Dist. of Cal., Dalkon Shield IUD Prods. Liab. Litig., 693 F.2d 847, 854-55 (9th Cir. 1982). However, some products liability cases may satisfy Rule 23 and proceed as class actions, and we have not prohibited class certification of products liability actions per se. Valentino, 97 F.3d at 1230-33; see also In re Am. Med. Sys., Inc., 75 F.3d 1069, 1084 (6th Cir. 1996) (courts must exercise great care before certifying products liability class, because such cases usually involve factual and legal issues that vary dramatically from individual to individual).
 
 II.
 
 22
 Zinser argues that the district court erroneously concluded that the law of multiple jurisdictions applies. Instead, Zinser asserts that Colorado and Delaware law properly applies to all class members' claims. On this central issue, we disagree.
 
 
 23
 We review de novo a district court's choice of law determination. Contact Lumber Co. v. P.T. Moges Shipping Co., Ltd., 918 F.2d 1446, 1450 (9th Cir. 1990). We review factual findings underlying a choice of law determination pursuant to the "clearly erroneous" standard. Id.
 
 
 24
 A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law. Klaxon Co. v. Stentor Elec. Mfg. Co. Inc., 313 U.S. 487, 496 (1941). California, the forum state here, applies the governmental interest approach to conflict of law questions, which is characterized as a three step process:
 
 
 25
 Under the first step of the governmental interest approach, the foreign law proponent must identify the applicable rule of law in each potentially concerned state and must show it materially differs from the law of California . . . . If . . . the trial court finds the laws are materially different, it must proceed to the second step and determine what interest, if any, each state has in having its own law applied to the case . . . . Only if the trial court determines that the laws are materially different and that each state has an interest in having its own law applied, thus reflecting an actual conflict, must the court take the final step and select the law of the state whose interests would be `more impaired' if its law were not applied.
 
 
 26
 Wash. Mut. Bank v. Superior Court, 15 P.3d 1071, 1080-81 (Cal. 2001) (citations omitted) (emphasis in original); see also In re Pizza Time Theatre Sec. Litig., 112 F.R.D. 15, 19 (N.D. Cal. 1986).
 
 
 27
 Zinser initially argued that California law should apply to the claims of all putative class members. However, the district court correctly noted that "[p]laintiff does not show how application of California law satisfies constitutional due process requirements in this case." On appeal, Zinser concedes that under Phillips Petroleum Co. v. Shutts, 472 U.S. 797 (1985), California law cannot be constitutionally applied to all putative class members. Zinser now argues that the law of Colorado should apply to the negligence, products liability, and medical monitoring claims, while the law of Delaware and Colorado should apply to the derivative claims.[4] Because Zinser seeks to invoke the law of a jurisdiction other than California, she bears the burden of proof. Wash. Mut., 15 P.3d at 1080-81 (under California choice of law rules, foreign law proponent bears burden of establishing true conflict). We conclude that Zinser fails to meet her burden of showing Colorado law applies to the designated claims of negligence, products liability, and medical monitoring.
 
 
 28
 Although Zinser acknowledges that every state has an interest in having its law applied to its resident claimants, she nevertheless asserts that Colorado law should apply to all putative class members. To support this assertion, Zinser argues: (1) that ARI is headquartered in Colorado;[5] (2) that Colorado's government has expressed an interest in ensuring the manufacture and distribution of safe products from its state;[6] and (3) that the application of a single state's law will allow claims to be adjudicated on a class basis.
 
 
 29
 Zinser misconstrues California choice of law rules. As the district court explained, "the three-part California choice of law inquiry requires comparison of each non-forum state's law and interest with California's law and interest separately." (Citing Pizza Time, 112 F.R.D. at 20). As required by California law, Zinser thus must apply California's three-part conflict test to each non-forum state with an interest in the application of its law. Pizza Time, 112 F.R.D. at 20; Liew v. Official Receiver & Liquidator, 685 F.2d 1191, 1196-97 (9th Cir. 1982). Also, because Zinser seeks certification of three separate claims -negligence, products liability, and medical monitoring -this conflicts test must be applied to each claim upon which certification is sought. Wash. Mut. , 15 P.3d at 1081 ("These rules apply whether the dispute arises out of contract or tort . . . and a separate conflict of laws inquiry must be made with respect to each issue in the case."); see also Castano v. Am. Tobacco Co., 84 F.3d 734, 743 n.15 (5th Cir. 1996) (" `[B]ecause we must apply an individualized choice of law analysis to each plaintiff's claims, the proliferation of disparate factual and legal issues is compounded exponentially . . . .' ") (quoting Georgine v. Amchem Prods., Inc., 83 F.3d 610, 626 (3d Cir. 1996)).
 
 
 30
 Zinser does not explain how each non-forum state's law differs from California law, whether each non-forum state has an interest in having its law applied, or whether each nonforum state has an interest outweighing California's interest. The district court made this point clearly, reasoning:
 
 
 31
 Colorado law could be applied to a nationwide class under California choice of law rules only if Colorado law were the sole non-forum law to conflict with California law and if Colorado were the sole state with an interest that outweighed California's interest.
 
 
 32
 Because, as the district court noted, "the laws of negligence, product[s] liability, and medical monitoring all differ in some respects from state to state," In re Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1300-01 (7th Cir. 1995); In re Telectronics, 168 F.R.D. at 215-17, Zinser has not established that Colorado is the only non-forum law to conflict with California law. Further, Zinser has not persuaded us that Colorado's interest in this litigation outweighs California's.
 
 
 33
 We hold that Zinser has not met her burden to establish that Colorado law applies to the negligence, products liability, and medical monitoring claims of each putative class member. The district court correctly rejected the contention that the law of a single state -either California or Colorado --applies to this action.
 
 III.
 
 34
 Zinser next argues that even if the law of multiple jurisdictions applies, Rule 23(b)(3) class certification is appropriate because common questions of law and fact predominate over individual issues and because a class action is the superior method of resolving the claims. Zinser, as the party seeking class certification, bears the burden of showing that common questions of law or fact predominate. Hanon, 976 F.2d at 508.
 
 
 35
 Pursuant to Rule 23(b)(3), a court may certify a class only if it first determines that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Although interrelated, we address these issues independently. See, e.g., Valentino, 97 F.3d at 1234-35.
 
 A. Predominance
 
 36
 "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." Valentino, 97 F.3d at 1234.
 
 
 37
 Zinser argues that the district court abused its discretion by holding that variances in state laws overwhelm common issues of fact. Citing Telectronics, 172 F.R.D. at 290-94, Zinser maintains predominance is not destroyed and the case is still manageable as a class action despite the application of the law of multiple jurisdictions. We disagree.
 
 
 38
 Understanding which law will apply before making a predominance determination is important when there are variations in applicable state law. "[W]here the applicable law derives from the law of the 50 states, as opposed to a unitary federal cause of action, differences in state law will `compound the [ ] disparities' among class members from the different states." Chin v. Chrysler Corp., 182 F.R.D. 448, 453 (D. N.J. 1998) (quoting Amchem Prods., Inc., v. Windsor, 521 U.S. 591, 624 (1997)) (second alteration in original). Because Zinser seeks certification of a nationwide class for which the law of forty-eight states potentially applies, she bears the burden of demonstrating "a suitable and realistic plan for trial of the class claims." Chin, 182 F.R.D. at 454; see also Valentino, 97 F.3d at 1234 (district court abused its discretion certifying class because plaintiffs did not show how class trial could be conducted); Castano, 84 F.3d at 742 (court cannot rely merely on assurances of counsel that any problems with predominance or superiority can be overcome); Am. Med. Sys., 75 F.3d at 1085 (when more than a few state laws differ, court would be faced with impossible task of instructing jury on relevant law).
 
 
 39
 Certainly, there may be common issues in this case, such as those relating to liability to the extent that any alleged defect in the 854 lead may have been caused by ARI's alleged negligence. But to determine causation and damages for each of the three claims asserted here, it is inescapable that many triable individualized issues may be presented. For example, was the alleged defect in the 854 lead caused by negligent manufacture? Was it caused by negligent shipping or handling? Was it caused by improper handling of the lead by physicians or medical staff? Or was it caused by some combination of these or other factors? As cogently explained by a leading commentator:
 
 
 40
 [I]f the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate . . . . Moreover, when individual rather than common issues predominate, the economy and efficiency of class action treatment are lost and the need for judicial supervision and the risk of confusion are magnified.
 
 
 41
 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, Federal Practice and Procedure§§ 1778 at 535-39 (2d ed. 1986) (footnotes omitted).
 
 
 42
 The complexity of the trial would be further exacerbated to the extent that the laws of forty-eight states must be consulted to answer such questions. See Castano, 84 F.3d at 741 ("proliferation of disparate factual and legal issues is compounded exponentially" when law of multiple jurisdictions apply).
 
 
 43
 The case relied upon by Zinser, Telectronics, is distinguishable. There, the district court initially declined to certify the class pursuant to Rule 23(b)(3), reasoning:
 
 
 44
 The Plaintiffs simply assert that any nuances or differences in state law that do exist "can be handled by the creation of subclasses and separate jury interrogatories." The Plaintiffs, however, bear the burden of establishing appropriate subclasses and demonstrating that each subclass meets the Rule 23 requirements . . . . The Plaintiffs must come forward with the exact definition of each subclass, its representatives, and the reasons each subclass meets the prerequisites of Rule 23(a) and (b).
 
 
 45
 Telectronics, 168 F.R.D. at 221. Following this directive, the plaintiffs filed a renewed motion for class certification, proposing ten subclasses and three sub-subclasses with proper representatives for each. The court granted the renewed motion for certification only after the plaintiffs created subclasses with proper representatives for each. Telectronics, 172 F.R.D. at 278.
 
 
 46
 Here, the district court declined certification for precisely the same reasons originally advanced by the Telectronics court. The district court held:
 
 
 47
 Plaintiff raises the alternative argument that even if neither California nor Colorado law applies to all claims of the nationwide class, the proposed subclasses can be further divided into manageable subclasses which take into account conflicts in state laws. However, Plaintiff has not presented representative plaintiffs for those subclasses, nor has she demonstrated that each subclass meets the Rule 23 requirements.
 
 
 48
 The district court thus concluded that there was no manageable trial plan adequate to deal with individualized issues and variances in state law. We find no abuse of discretion in this respect.
 
 B. Superiority
 
 49
 Zinser also argues that class adjudication is superior to other methods of adjudication because "classwide litigation of common issues will reduce litigation costs and promote greater efficiency." Valentino, 97 F.3d at 1234. In determining superiority, courts must consider the four factors of Rule 23(b)(3). "A consideration of these factors requires the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." 7A CHARLES ALANWRIGHT, ARTHUR R. MILLER & MARY KAY KANE, Federal Practice and Procedure §§ 1780 at 562 (2d ed. 1986). The application of each factor here demonstrates that the district court did not abuse its discretion when it held that class action treatment was not appropriate.
 
 1. Rule 23(b)(3)(A)
 
 50
 The first factor is the interest of each member in"individually controlling the prosecution or defense of separate actions." Fed. R. Civ. P. 23(b)(3)(A). Where damages suffered by each putative class member are not large, this factor weighs in favor of certifying a class action. See, e.g., Dalkon Shield, 693 F.2d at 856.
 
 
 51
 Here, Zinser's amended class action complaint states: "Without reference to punitive damages, which are sought as well as compensatory damages, the amount in controversy in compensatory damages alone for each plaintiff/class members [sic] exceeds the sum of $50,000.00 exclusive of interest and costs." (emphasis added). To a degree, this statement undermines Zinser's assertion that the claims have a relatively small value.[7] We recognize that a party with a claim of $50,000 might have a difficult time alone pursuing a complex products liability case. However, the minimum amount alleged to be in controversy for each putative class member does not argue persuasively for class certification. See 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, Federal Practice and Procedure§§ 1779 at 557 (2d ed. 1986) ("For example, a group composed of consumers or small investors typically will be unable to pursue their claims on an individual basis because the cost of doing so exceeds any recovery they might secure. When this is the case it seems appropriate to conclude that the class action is superior to other available methods for the fair and efficient adjudication of the controversy.") (internal quotation marks omitted).
 
 2. Rule 23(b)(3)(B)
 
 52
 The second factor is "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class." Fed. R. Civ. P. 23(b)(3)(B).
 
 
 53
 This factor is intended to serve the purpose of assuring judicial economy and reducing the possibility of multiple lawsuits . . . . If the court finds that several other actions already are pending and that a clear threat of multiplicity and a risk of inconsistent adjudications actually exist, a class action may not be appropriate since, unless the other suits can be enjoined, . . . a Rule 23 proceeding only might create one more action . . . . Moreover, the existence of litigation indicates that some of the interested parties have decided that individual actions are an acceptable way to proceed, and even may consider them preferable to a class action. Rather than allowing the class action to go forward, the court may encourage the class members who have instituted the Rule 23(b)(3) action to intervene in the other proceedings.
 
 
 54
 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, Federal Practice and Procedure§§ 1780 at 568-70 (2d ed. 1986) (footnotes omitted).
 
 
 55
 Here, the district court noted that "[a]lthough thousands of patients were implanted with the ENCOR lead, only nine lawsuits are pending; this indicates that individual litigation may be sufficient to satisfy potential claims." Further, although Zinser relies upon the Telectronics litigation as support for certification, there ARI faced claims filed on behalf of over 900 individual implantees, and joinder might have been impractical.
 
 3. Rule 23(b)(3)(C)
 
 56
 The third factor is "the desirability or undesireablity of concentrating the litigation of the claims in the particular forum." Fed. R. Civ. P. 23(b)(3)(C).
 
 
 57
 We are persuaded by the reasoning of Haley v. Medtronic, Inc., 169 F.R.D. 643 (N.D. Cal. 1996):
 
 
 58
 In this case, where the potential plaintiffs are located across the country and where the witnesses and the particular evidence will also be found across the country, plaintiffs have failed to establish any particular reason why it would be especially efficient for this Court to hear such a massive class action lawsuit.
 
 
 59
 Id. at 653. Similarly, Zinser offers no adequate justification for the concentration of the litigation in this particular forum.
 
 4. Rule 23(b)(3)(D)
 
 60
 The fourth factor is "the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3)(D). We have previously held that when the complexities of class action treatment outweigh the benefits of considering common issues in one trial, class action treatment is not the "superior" method of adjudication. Valentino, 97 F.3d at 1234-35; Dalkon Shield, 693 F.2d at 856; see also Am. Med. Sys., 75 F.3d at 1085; Haley, 169 F.R.D. at 653. This rule applies here, and we conclude that the complexities of class action treatment weigh heavily against class certification.
 
 
 61
 If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not "superior." See, e.g., Dalkon Shield, 693 F.2d at 856; Walsh v. Ford Motor Co., 807 F.2d 1000, 1017 (D.C. Cir. 1986); Haley, 169 F.R.D. at 654. We are persuaded by the logic of Haley, a proposed class action involving allegedly defective pacemaker leads:
 
 
 62
 Here, the allegedly negligent pacemaker leads were implanted in different individuals in different states by different doctors. As a result, the causes of plaintiffs' injuries are not entirely the same, since the injuries did not occur at the same time, place or under the same conditions. Given the fact that approximately 66,000 individuals had these leads implanted, there are potentially 66,000 different instances that the Court would have to examine to determine if defendant's conduct was the real cause of injury for each potential plaintiff. Under these circumstances, there are just too many individual issues for the Court to manage for class adjudication to be deemed superior, even though there is a common nucleus of facts concerning defendant's conduct. Of course, we do not suggest that the causation difficulties necessarily render class certification impossible.
 
 
 63
 Id. at 654.
 
 
 64
 Here, evidence suggests that deformation of the "J" wire decreases its resistance to fatigue. This in turn may result in fracture, causing injury to patients if the wire protrudes through the insulation. ARI argues, and we agree, that it may be difficult to establish a common cause of injury because many factors may contribute to "J" wire deformation, including manufacturing and shipping history and handling of the lead by physicians or staff. See id. at 654 ("Given all of these extremely complicated and individual issues, it would seem unwise -and unmanageable -for the Court to independently attempt to handle this case."). In view of the formidable complexities here inherent in trying claims of negligence, products liability, and medical monitoring with differing state laws, Zinser does not persuade us that class treatment is superior to individual adjudication. See Am. Med. Sys., 75 F.3d at 1085.
 
 
 65
 Because Zinser fails to demonstrate predominance and superiority, we hold that the district court did not abuse its discretion by refusing to certify the proposed class pursuant to Rule 23(b)(3).[8]
 
 IV.
 
 66
 Zinser next argues that certification of the proposed medical monitoring subclass is appropriate pursuant to Rule 23(b)(1)(A) because separate actions create a risk that ARI will be subject to incompatible standards for monitoring class members' leads. Because we conclude that the medical monitoring claim primarily seeks monetary damages, we affirm the district court's denial of certification of the medical monitoring subclass.
 
 
 67
 A class action is maintainable under Rule 23(b)(1)(A) if "prosecution of separate actions . . . would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class . . . ." Fed. R. Civ. P. 23(b)(1)(A). The phrase "incompatible standards of conduct" refers to the situation where"different results in separate actions would impair the opposing party's ability to pursue a uniform continuing course of conduct." 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, Federal Practice and Procedure§§ 1773 at 431 (2d ed. 1986) (footnote omitted). Rule 23(b)(1)(A) certification requires more, however, "than a risk that separate judgments would oblige the opposing party to pay damages to some class members but not to others or to pay them different amounts . . . ." Id. at 429. Certification under Rule 23(b)(1)(A) is therefore not appropriate in an action for damages. See, e.g., Green v. Occidental Petroleum Corp., 541 F.2d 1335, 1340 (9th Cir. 1976); McDonnell Douglas Corp. v. U.S. Dist. Court, 523 F.2d 1083, 1086 (9th Cir. 1975).[9]
 
 
 68
 As support for her Rule 23(b)(1)(A) medical monitoring subclass argument, Zinser relies on Telectronics . There, the district court noted that although ARI was conducting a research program to investigate and detect the cause of the lead fractures, "[p]laintiffs seek the establishment of a medical monitoring program which would include diagnostic testing and research." Telectronics, 172 F.R.D. at 285. The court thus reasoned that any judicially imposed modification of the research program -a uniform benefit to the class of lead implantees -logically would affect the entire class. Id.
 
 
 69
 The salient facts here, however, are quite different. Here, Zinser's amended complaint does not seek the establishment of a medical monitoring program -presumably because such a program already exists -but rather seeks "the creation of a medical monitoring fund." Specifically, Zinser's amended complaint requests that the court order:
 
 
 70
 (1) [the defendants to] pay the cost of notifying all class members of the unreasonably dangerous and defective nature of its Leads and other pertinent related information; (2) that defendants create a medical monitoring fund . . . for the purpose of monitoring in the future the health and well being of plaintiff and the other class members; (3) that defendants be required to pay all future medical expenses in any way related to its defective product; and (4) that defendants be ordered to conduct full and proper research into alternative methodologies for remedying the condition of each patient/class member . . ..
 
 
 71
 From this, it is apparent that the requested "medical monitoring fund" is in essence a request for monetary relief. Moreover, the complaint also seeks past and future compensatory damages plus punitive damages. We conclude that Zinser primarily seeks money damages.[10]
 
 
 72
 Zinser contends that the issue is not whether ARI must pay for the monitoring, but instead what type of monitoring must be performed. Zinser does not, however, demonstrate how ARI's current patient management guidelines and screening program are inadequate. More importantly, Zinser does not demonstrate how separate adjudications will force ARI to comply with inconsistent standards of conduct that it cannot legally pursue.
 
 
 73
 Even if multiple courts were to formulate separate medical monitoring programs as Zinser urges may occur, Rule 23(b)(1)(A) certification is still not appropriate. As we explained in La Mar v. H & B Novelty & Loan Co. , 489 F.2d 461 (9th Cir. 1973):
 
 
 74
 Rule 23(b)(1)(A) authorizes class actions to eliminate the possibility of adjudications in which the defendant will be required to follow inconsistent courses of continuing conduct. This danger exists in those situations in which the defendant by reason of the legal relations involved can not as a practical matter pursue two different courses of conduct. The Advisory Committee's Note makes this clear in discussing Rule 23(b)(1)(A) by its reference to actions to declare bond issues invalid, to fix the rights and duties of a riparian owner, and to determine a landowner's rights and duties respecting a claimed nuisance.
 
 
 75
 Id. at 466 (footnotes omitted). Any administrative difficulty ARI potentially might face from slightly different medical monitoring programs required by different courts for differently situated potential claimants does not rise to the level of requiring of ARI inconsistent courses of conduct.
 
 
 76
 We therefore hold that the district court did not abuse its discretion by refusing to certify the proposed medical monitoring subclass pursuant to Rule 23(b)(1)(A).[11]
 
 V.
 
 77
 Zinser also contends that the district court abused its discretion by refusing to certify the proposed medical monitoring subclass pursuant to Rule 23(b)(2).
 
 
 78
 Rule 23(b)(2) provides that a class action is appropriate if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. " Fed. R. Civ. P. 23(b)(2). Class certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive. Nelsen v. King County, 895 F.2d 1248, 1254-55 (9th Cir. 1990); O'Connor v. Boeing N. Am., Inc. , 180 F.R.D. 359, 377 (C.D. Cal. 1997); Haley, 169 F.R.D. at 657. A class seeking monetary damages may be certified pursuant to Rule 23(b)(2) where such relief is "merely incidental to [the] primary claim for injunctive relief." Probe v. State Teachers' Retirement Sys., 780 F.2d 776, 780 (9th Cir. 1986).
 
 
 79
 Zinser contends that a medical monitoring claim is primarily equitable or injunctive. A request for medical monitoring cannot be categorized as primarily equitable or injunctive per se. Many courts, including California state courts, have recognized that medical monitoring relief is appropriate only as an element of damages after independent proof of liability. See Potter v. Firestone Tire and Rubber Co., 863 P.2d 795, 823 (Cal. 1993); see also Telectronics, 168 F.R.D. at 215-17 (discussing state variations regarding treatment of medical monitoring claim).
 
 
 80
 Because Rule 23(b)(2) certification is inappropriate where the primary relief sought is monetary, Nelsen , 895 F.2d at 1254, the dispositive question is: What type of relief does Zinser primarily seek? We find the following discussion helpful and strikingly persuasive by analogy here:
 
 
 81
 Plaintiffs do not seek a court-established medical monitoring program solely for the purposes of diagnosing disease and sharing information with class members. Rather Plaintiffs seek the establishment of a "reserve fund to pay for the cost of the medical monitoring program," which includes medical examinations of class members, as well as treatment of disease detected in class members. Plaintiffs additionally seek punitive and compensatory damages for the Class. Thus, the medical monitoring program Plaintiffs seek does not resemble that held in Day as appropriate injunctive relief. In fact, Plaintiffs' proposed program does not resemble any programs certified under Rule 23(b)(2).
 
 
 82
 O'Connor, 180 F.R.D. at 377 n.23 (citation omitted).
 
 
 83
 Courts have split on whether medical monitoring relief is primarily compensatory or injunctive. Depending on the nature of the precise relief sought and the circumstances of the particular case, many courts have declined to certify medical monitoring classes when joined with requests for funding and compensation. See Boughton v. Cotter Corp. , 65 F.3d 823, 827 (10th Cir. 1995) (although certification of medical monitoring class under Rule 23(b)(2) is legally permissible, district court did not abuse its discretion in refusing to certify such a class where the relief sought was primarily money damages); Cook v. Rockwell Int'l Corp., 181 F.R.D. 473, 479-80 (D. Colo. 1998) (even where relief sought was diagnostic testing and medical screening necessary to facilitate early detection and treatment of disease, rather than damages for past, present, or future injury, such relief was primarily a suit for damages); Arch v. Am. Tobacco Co., 175 F.R.D. 469, 483-85 (E.D. Pa. 1997) (Rule 23(b)(2) certification inappropriate where plaintiffs' medical monitoring program included not only periodic examinations but also a fund for treatment because the "request for treatment drastically alters the nature of the relief requested by plaintiffs . . . [making it] identical to a traditional damage claim for personal injury"); Haley, 169 F.R.D. at 657 (Rule 23(b)(2) certification improper for class seeking medical monitoring program and damages because medical monitoring, while not incidental to action for monetary damages, was not primary goal). Compare Yslava v. Hughes Aircraft Co., 845 F. Supp. 705, 708, 712 (D. Ariz. 1993) (certifying class for court-supervised medical monitoring program to detect disease when damages sought were for medical monitoring costs incurred, rather than other compensatory and punitive damages); Craft v. Vanderbilt Univ., 174 F.R.D. 396, 406 (M.D. Tenn. 1996) (noting authority supporting proposition that "medical monitoring, if properly framed, can be a form of injunctive relief.").
 
 
 84
 We conclude that Zinser's proposed medical monitoring subclass is not appropriate for certification pursuant to Rule 23(b)(2). The amended class action complaint here seeks the establishment of a reserve fund for past and future damages, compensation for future medical treatment, plus other compensatory and punitive damages. Although the complaint also seeks "full and proper research into alternative methodologies for remedying the condition of each patient/class member," this injunctive relief is merely incidental to the primary claim for money damages.
 
 
 85
 We hold that the district court did not abuse its discretion by refusing to certify the proposed medical monitoring subclass pursuant to Rule 23(b)(2).
 
 VI.
 
 86
 Zinser argues that certification of the class and subclasses is also appropriate pursuant to Rule 23(b)(1)(B) because this case involves a limited fund. Certification pursuant to Rule 23(b)(1)(B) is justified if adjudications by individual members of the class would "as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests." Fed. R. Civ. P. 23(b)(1)(B).
 
 
 87
 Class actions are permitted under Rule 23(b)(1)(B) if separate actions "inescapably will alter the substance of the rights of others having similar claims." McDonnell , 523 F.2d at 1086. The Supreme Court has held that certain characteristics are "presumptively necessary, and not merely sufficient, to satisfy the limited fund rationale . . . ." Ortiz v. Fibreboard Corp., 527 U.S. 815, 842 (1999). Thus, to satisfy Rule 23(b)(1)(B), a class action plaintiff must demonstrate that the case involves a " `fund' with a definitely ascertained limit, all of which would be distributed to satisfy all those with liquidated claims based on a common theory of liability, by an equitable, pro rata distribution." Id. at 841.
 
 
 88
 The district court rejected Zinser's assertion that this test could be satisfied and that certification of the proposed class and subclasses is therefore appropriate under Rule 23(b)(1)(B) because of a "limited fund."
 
 
 89
 Plaintiff argues that the settlement in the Ohio In re Telectronics litigation left ARI with only two limited funds from which it must pay all of its operating and litigating costs. However, Plaintiff provides no evidence indicating either that the $6.75 million litigation fund is insufficient to cover plaintiffs' claims, or that plaintiffs will be unable to reach the $10 million operating fund. Moreover, Plaintiff points to no evidence concerning holdings of Defendants Pacific Dunlop and Nucleus, and presents conflicting accounts of whether insurance coverage will be available.
 
 
 90
 (footnote and citation omitted).
 
 
 91
 Also, the Sixth Circuit recently rejected Rule 23(b)(1)(B) certification of the Telectronics class for similar reasons. As the district court did here, the Sixth Circuit questioned whether the case presents a "limited fund," viewing both Pacific Dunlop and Nucleus as solvent and potentially liable. Telectronics, 221 F.3d at 878. The court reasoned that "[w]e cannot approve a settlement that releases these parent companies from all liability and leaves class members with no recourse against them." Id. at 879.
 
 
 92
 Zinser has not demonstrated that the assets potentially available to claimants are so limited that separate actions "inescapably will alter" the rights of other claimants. The district court did not abuse its discretion by refusing to certify the proposed class and subclasses pursuant to Rule 23(b)(1)(B).
 
 CONCLUSION
 
 93
 The district court did not abuse its discretion when it denied class certification pursuant to Rule 23(b)(1)(A), (b)(1)(B), (b)(2), and (b)(3).
 
 
 94
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The ENCOR 033-856 lead uses a"J" retention wire and has a similar construction to the 854 lead. The 033-856 was not implanted into patients in the United States, however, and is not the subject of this litigation.
 
 
 [2]
 Although the parties to the Telectronics litigation reached a settlement committing substantially all of ARI's assets, the Sixth Circuit recently decertified the limited fund class and disapproved the settlement. In re Telectronics Pacing Systems, Inc., Accufix Atrial"J" Leads Products Liability Litig., 221 F.3d 870, 882 (6th Cir. 2000) ("limited fund" rationale of Rule 23(b)(2)(B) does not apply where the available funds are limited only by agreement of the parties). The Sixth Circuit also disagreed with the district court's conclusion that Zinser's motion to intervene was untimely. Id.
 
 
 [3]
 In addition to challenging the district court's disposition of Rule 23(b), Zinser maintains that she has also satisfied Rule 23(a). Because we affirm the district court's denial of class certification pursuant to Rule 23(b), we do not address Zinser's Rule 23(a) arguments.
 
 
 [4]
 Zinser sought certification only on the negligence, products liability, and medical monitoring fund claims. Apparently for this reason, the district court did not undertake a choice of law analysis with respect to the derivative claims. Because Zinser did not seek certification of the derivative claims, we will not address the choice of law arguments relating to these claims.
 
 
 [5]
 Although ARI is now headquartered in Colorado, Zinser has not demonstrated that it was headquartered there when the 854 leads were designed, manufactured, and distributed.
 
 
 [6]
 Zinser has also failed to demonstrate that the 854 leads were manufactured in or distributed out of Colorado.
 
 
 [7]
 It also suggests that individual claims might economically and reasonably be pursued individually or permissively joined. See 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, Federal P ractice and Procedure §§ 1779 at 552 (2d ed. 1986) ("The most obvious alternative to a class action is to remit the class members to the institution of individual actions. The 1966 amendments to the civil rules, which expanded their already liberal joinder policy and significantly enlarged the right to intervene under Rule 24 have made this a more realistic possibility than it once was.") (Footnotes omitted).
 
 
 [8]
 While the dissent agrees with our conclusion that class certification under Rule 23(b)(3) is inappropriate at the present time, it would have us hold that if Zinser were to propose proper representative subclasses based on state law commonalities at some future point in time, Rule 23(b)(3) would be satisfied. Our review, however, is limited to assessing the district court's exercise of discretion based on the actual request for class certification advanced by the plaintiff.
 The dissent also urges that the proposed medical monitoring subclass merits certification under Rule 23(b)(3). Again the dissent contends that if Zinser were to propose two sub-subclasses, any manageability problems due to variations in state law could be resolved. As an initial matter, variations in state law cannot be so simply resolved. For example, some states recognize medical monitoring as a separate cause of action. Compare Friends For All Children, Inc. v. Lockheed Aircraft Corp., 746 F.2d 816, 824-25 (D.C. Cir. 1984) (holding District of Columbia recognizes a cause of action for medical monitoring without manifestation of physical injury) with Burton v. R.J. Reynolds Tobacco Co., 884 F. Supp. 1515, 1523 n.6 (D. Kan. 1995) (stating that a claim is recognized in Kansas only if the plaintiff has not yet suffered injuries; otherwise, medical monitoring is merely a component of damages). Others, however, recognize medical monitoring only as an element of damages when liability is established under traditional tort theories of recovery. See Telectronics, 168 F.R.D. at 215-17 (discussing state variations regarding treatment of medical monitoring claim). But variations of state law aside, the question we must answer is whether the district court abused its discretion in refusing to certify the proposed medical monitoring subclass. Rule 23(c)(4), in a proper case, may enable the district court to recognize subclasses that have proper representatives and otherwise comply with Rule 23's requirements. This does not mean, however, that the district court abused its discretion by refusing to certify a subclass that does not comply with Rule 23.
 
 
 [9]
 Courts have held that class certification pursuant to Rule 23(b)(1)(A) is appropriate in a variety of situations.
 These include a suit to enjoin state officers from terminating unemployment compensation without a hearing, an action for a declaratory judgment with respect to plaintiff's insurance liability on an illegally declared dividend, and an action seeking a declaration of eligibility for deferments under the Selective Service Act. A class action seeking rescission of purchases of securities that allegedly were made on the basis of fraudulent misrepresentations also has been allowed under clause (1)(A).
 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KAN E, Federal Practice and Procedure §§ 1773 at 435 (2d ed. 1986) (citing Crow v. California Dep't of Human Resources, 325 F. Supp. 1314 (N.D. Cal. 1970); Federal Sav. & Loan Ins. Corp. v. Huttner, 265 F. Supp. 40 (N.D. Ill. 1967); Gregory v. Hershey, 51 F.R.D. 188 (E.D. Mich. 1970); Sultan v. Bessemer-Birmingham Motel Assocs., 322 F. Supp. 86 (S.D.N.Y. 1970)).
 
 
 [10]
 For further treatment of this issue, see part V, infra.
 
 
 [11]
 Favoring the reasoning of the district court in Telectronics, the dissent disagrees. While conceding that there are some "minor factual differences" between the medical monitoring class certified in Telectronics and that proposed here, the dissent would overlook these differences and hold that the district court abused its discretion by denying certification under Rule 23(b)(1)(A). We respectfully disagree. Zinser has not demonstrated that Accufix "by reason of the legal relations involved can not as a practical matter pursue two different courses of conduct. " La Mar v. H & B Novelty & Loan Co., 489 F.2d 461, 466 (9th Cir. 1973). As such, the district court properly denied certification under Rule 23(b)(1)(A).
 
 
 B. FLETCHER, Circuit Judge, dissenting:
 
 95
 I respectfully dissent. In deciding all of the issues against Zinser and in favor of ARI, the majority opinion seriously distorts federal class action law by collapsing the Rule 23(b)(1)(A) certification inquiry into that of Rule 23(b)(2). In the process, the majority opinion virtually ignores the holding of the Ohio district court in a parallel suit against the same defendants, see In re Telectronics Pacing Sys., Inc., 172 F.R.D. 271 (S.D. Ohio 1997), as well as that of the Sixth Circuit, which declined to disturb the relevant certification decisions of the district court.[1] The net result, I fear, is that thousands of potential plaintiffs in this case will have no practical means of redress for their injuries.
 
 
 96
 As I understand it, the Encor 854 leads are essentially the same ones (or at least are alleged to suffer from the same defects, including the J-shaped design flaw) implicated in Telectronics. Zinser cites evidence that ARI's own studies have found a rising incidence of 854 lead fractures and that it has finally decided to recall the product, even though it initially refused to do so (and permitted continued implantation of the potentially defective leads) at the time it was forced to recall the similar J-leads at issue in Telectronics. Thus, although the number of complainants may have been fairly low at the time of filing, the potential class of plaintiffs may well have grown to be quite sizeable. Cf. Haley v. Medtronic, Inc., 169 F.R.D. 643, 648 (C.D. Cal. 1996) (finding in the context of Rule 23(a)(1)'s numerosity requirement that "[g]iven the vast number of people who have had the [Medtronic pacemaker] leads implanted, it is likely that the number of lawsuits that will be filed in the near future is likely to increase substantially.") All in all, I am concerned that outside of a class action, given the relatively small recoveries at stake, individuals implanted with these leads are likely to find it extremely difficult, if not impracticable, to individually litigate the costs of injury and health maintenance.
 
 
 97
 The majority finds that neither common issues of fact or law predominate under Rule 23(b)(3). This finding squarely conflicts with the reasoning of the Telectronics court, as well as that of the Haley court (which the majority otherwise cites selectively in support of its conclusions). For example, the majority repeatedly contends that a plethora of individual factual questions makes this case unsuitable for class certification. Maj. Op. ____, ____. However, as the district court noted in Telectronics, the sheer number of fractured leads, combined with the fact that the product had been recalled, strongly suggested a single cause of injury. Telectronics, 172 F.R.D. at 289. Similarly, here ARI's own findings of the increasing incidence of fractures and defects which led it finally to recall the 854 leads strongly suggests to me that, in the language of the Telectronics court,"the most significant common issue which predominates in this action is whether [ARI] is legally responsible for the fractures." Id.
 
 
 98
 Likewise, in Haley, the court found that"because . . . defendant's conduct with regard to the design, manufacture and distribution of the leads and defendant's representations about these leads are at the heart of all plaintiffs' cases, . . . common questions of law and fact do predominate in the instant case." Haley, 169 F.R.D. at 651 (finding that while common issues predominated, a class action would nonetheless not be a superior method of resolving plaintiffs' claims, in large part due to the manageability problems associated with applying a multiplicity of state laws).[2] In sum, although I believe that Rule 23(b)(3) certification of the negligence and products liability causes of action would be inappropriate at the present time because California's choice-of-law rules would make the adjudication of these claims unmanageable, I otherwise find that common issues predominate in this action, consistent with the Telectronics court's conclusion that with appropriate and representative subclasses based on state law commonalities, the Rule 23(b)(3) requirements of predominance and superiority would be satisfied.[3]
 
 
 99
 Most importantly, with respect to the proposed medical monitoring subclass, the majority opinion completely ignores the analysis of the district court in Telectronics. In the words of that court, "The medical monitoring claim here is an ideal candidate for class certification pursuant to Rule 23(b)(1)(A) because separate adjudications would impair TPLC's ability to pursue a single uniform monitoring program." Telectronics, 172 F.R.D. at 284 (emphasis added). I agree. As in the present case, the plaintiffs in Telectronics claimed that the existing medical monitoring program was inadequate. Based on the pleadings here, I see no reason to deny certification under Rule 23(b)(1)(A).
 
 
 100
 Inexplicably, and utterly without case support, the majority opinion essentially collapses the Rule 23(b)(1)(A) inquiry into that of Rule 23(b)(2). Even if Zinser's medical monitoring claim essentially seeks damages (an assumption which I find questionable), this should not be dispositive under Rule 23(b)(1)(A). Indeed, inasmuch as Zinser seeks to compel ARI to provide increased research and diagnostic testing for all class members (i.e., beyond just fluoroscopies), the equitable component of the medical monitoring claim is highly significant. Rule 23(b)(1)(A) says nothing about whether the class also seeks damages; it only requires that "(1) the prosecution of separate actions by or against individual members of the class would create a risk of (A) inconsistent or varying adjudications . . . which would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ.P. 23(b)(1)(A).[4]
 
 
 101
 I particularly find the majority's assumption that ARI could only be confronted with "slightly different" medical monitoring requirements, Maj. Op. ____, to be altogether speculative and without support. In so doing, the majority substitutes an unadorned conclusory statement for sound legal reasoning. Tellingly, the majority ignores the plain language of Rule 23(b)(1), which only requires that individual actions prospectively "create a risk of" inconsistent judicial rulings and incompatible standards of conduct. Instead, the majority seems to suggest that in order to merit certification under Rule 23(b)(1)(A), plaintiffs bear the burden of actually demonstrating that a defendant "by reason of the legal relations involved can not as a practical matter pursue two different courses of conduct" -a near-insurmountable task in most cases. Maj. 7587. 26 n.11 (citation omitted). In sum, I cannot agree with the majority's minimization of the risk of inconsistent judicial rulings in this case, especially as the cohort of potential plaintiffs continues to grow.
 
 
 102
 Significantly, both Ninth Circuit cases cited as precedent for the majority holding -Green v. Occidental Petroleum Corp., 541 F.2d 1335, 1340 (9th Cir. 1976), and McDonnell Douglas Corp. v. U.S. Dist. Court, 523 F.2d 1083, 1086 (9th Cir. 1975) -involved plaintiffs who sought only damages; accordingly, Rule 23(b)(1)(A) certification was appropriately denied in those cases.[5] Here, by contrast, the majority opinion denies Rule 23(b)(1)(A) certification on the dubious ground that Zinser primarily seeks damages. Even if true, this constitutes an unwarranted and unsupported extension of our prior cases, and effectively collapses the Rule 23(b)(1)(A) inquiry into that of Rule 23(b)(2).
 
 
 103
 To be sure, there are some minor factual differences between the medical monitoring class certified in Telectronics and that proposed here, such as the requirement that the defendants pay the cost of notifying all class members; create a fund to pay for the cost of monitoring the health of class members; and pay all medical expenses related to defective leads. But for all practical (and legal) purposes, these differences are insignificant under the Rule 23(b)(1)(A) framework; indeed, if anything, the requested medical monitoring "fund" simply makes explicit whatever financial responsibility was inherent in the Telectronics medical monitoring proposal. Thus, I cannot see how the proposed medical monitoring subclass here "is in essence a request for monetary relief." Maj. Op. ____. Furthermore, even if it is, this should only be grounds for denying certification under Rule 23(b)(2), not Rule 23(b)(1)(A).
 
 
 104
 Finally, I believe the medical monitoring subclass also merits certification under Rule 23(b)(3). With respect to the predominance requirement, ARI's primary defense to Zinser's claim is that the current monitoring program is sufficient. As the Telectronics court reasoned, "[t]his defense is common to all implantees and is the predominant issue regarding the appropriateness of a court ordered medical monitoring program." Id. at 286 (citations omitted). Moreover, "practically speaking, for many of the `J' Lead recipients their only realistic claim may be for medical monitoring . . . . The superiority prong of Rule 23(b)(3) is satisfied if aggregation of small monetary claims is required to ensure vindication of legal rights." Id. at 286-87 (citations omitted). Any manageability problems due to variations in state law can be readily addressed, as in Telectronics, by the creation of two subclasses -one for states that require present physical injury to recover for medical monitoring, and one for states that do not pursuant to the court's authority under Rule 23(c)(4). Once this distinction is addressed, other "variations in state law regarding medical monitoring are immaterial. " Id. at 287.
 
 
 105
 In sum, because I find that the majority opinion completely neglects the persuasive reasoning of the Telectronics court and eviscerates the distinction between Rule 23(b)(1)(A) and Rule 23(b)(2), I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 In In re Telectronics Pacing Sys., Inc., 221 F.3d 870 (6th Cir. 2000), the Sixth Circuit recently vacated a proposed settlement on the ground that the limited fund rationale of Rule 23(b)(2)(B) does not apply when the available funds are limited only by agreement of the parties. All other issues, including the district court's certification decisions, were pretermitted. Id. at 882.
 
 
 [2]
 The majority opinion's analysis of the superiority prong of Rule 23(b)(3) also conflicts with Haley. In Haley, the court found that under Rule 23(b)(3)(A), "where the damages each plaintiff suffered are not that great, this factor weighs in favor of certifying a class action." Id. at 652. Furthermore, the court also found that the second criterion for determining superiority under Rule 23(b)(3)(B), the nature and extent of concurrent litigation, "slightly weigh[ed] in favor of granting class certification." Instead, it was "in particular" because of the manageability problems under Rule 23(b)(3)(D) that the Haley court deemed class certification to be inappropriate. Id. at 653.
 
 
 [3]
 Notwithstanding my conclusion that the choice-of-law problem renders Rule 23(b)(3) certification inappropriate at the present time, the majority somehow contends that based on our divergence on other issues of predominance and superiority, I "would have us hold that if Zinser were to propose proper representative subclasses based on state law commonalities at some future point in time, Rule 23(b)(3) would be satisfied." Maj. Op. 1192-93 n.8. To the contrary, such a holding would be tantamount to inserting the court into the role of plaintiff's counsel. Rather, I take issue with the further (and, I believe, unwarranted) conclusion in the majority opinion that, in addition to the choice-of-law problem, other individual issues of fact and law overwhelm common issues in this case. These findings unnecessarily conflict with Telectronics and Haley, and preclude the possibility that if Zinser did propose subclasses and appropriate representatives along the lines of what was done in Telectronics, the class would merit certification.
 
 
 [4]
 Like the majority, the district court below denied Rule 23(b)(1)(A) certification of the medical monitoring subclass because it determined that Zinser "seeks mostly damages." Although the majority makes much of the fact that our review of the district court's denial of class certification is for abuse of discretion, the district court's reliance upon an erroneous construction of Rule 23(b)(1)(A) constitutes a per se abuse of discretion. See Koon v. United States, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law.")
 
 
 [5]
 The majority opinion also quotes selectively from O'Connor v. Boeing North American, Inc., 180 F.R.D. 359 (C.D.Cal. 1997), while ignoring the discussion at footnote 22 of that opinion regarding the Telectronics decision. The O'Connor court correctly noted that because the defendant in Telectronics had already established a medical monitoring program for diagnostic testing and research, any judicially-imposed modification of the program would affect all class members. Furthermore, the class sought to establish a medical monitoring claim under Rule 23(b)(1)(A), rather than seek medical monitoring as a form of relief for some other claim. "Thus, if the class prevailed on their claim, the defendant would necessarily be required to treat all class members alike, as all class members would then be eligible for the medical monitoring program by virtue of winning their medical monitoring claim." Id. at 377 n.22.